996 F.2d 1035
 84 Ed. Law Rep. 91
 Gina GATES, Plaintiff-Appellant,
v.
UNIFIED SCHOOL DISTRICT NO. 449 OF LEAVENWORTH COUNTY,
KANSAS, Donald E. Simmons, individually and in his
official capacity as Principal, Pleasant
Ridge High School, Defendants-Appellees.
 No. 92-3218.
 United States Court of Appeals,
Tenth Circuit.
 June 21, 1993.
 
 Blaise R. Plummer of Carson & Fields, Overland Park, KS, for plaintiff-appellant.
 Jeffrey L. Baxter (Jeffrey E. Goering with him on the briefs) of Chapman, Waters and Baxter, Leavenworth, KS, for defendants-appellees.
 Before EBEL, BARRETT and KELLY, Circuit Judges.
 BARRETT, Senior Circuit Judge.
 
 
 1
 Plaintiff Gina L. Gates (Gates or Plaintiff) appeals the district court's grant of summary judgment in favor of defendants, Unified School District No. 449 of Leavenworth County, Kansas (School District or Board) and Donald E. Simmons, Principal of Pleasant Ridge High School (Simmons). We affirm.
 
 Background
 
 2
 Gates filed this suit pursuant to 42 U.S.C. § 1983 alleging that the School District and Simmons acted with deliberate indifference or reckless disregard in relation to a sexual assault committed against her on May 5, 1988, at Pleasant Ridge High School by teacher Michael Dragoo, who was hired in 1983 to teach Vocational Agriculture. On May 5, 1988, Gates was a junior, age 17. She sought damages in excess of $50,000, punitive damages, attorneys fees and costs.
 
 
 3
 In her complaint and in the Pretrial Order, Gates alleged that the School District, through its Board members, and Simmons, as Principal, were policymakers, and that on May 5, 1988, they either had knowledge of or reasonably should have known that Vocational-Agriculture teacher Michael Dragoo posed a threat to female students at the high school. Gates averred that the School District and Simmons knew of or should have known of the following: (1) Dragoo was counseled in 1984 concerning attending school functions with students and told that this could jeopardize his professional relationship; (2) in 1985, Dragoo became romantically involved with a female student, Cheryl Parker, and notwithstanding complaints to the school board concerning Dragoo's involvement with this student, his teaching contract was renewed; and (3) Donald Navinsky, a board member, had received information that Dragoo was pursuing Gates prior to the May 5, 1988, incident.
 
 
 4
 In their Answer and in the Pretrial Order, the defendants contended that (1) there was no evidence that the school board authorized or adopted any policy or custom tolerating inappropriate sexual conduct by teachers with female high school students, (2) there was no evidence that Superintendent Fagan or Principal Simmons authorized or tolerated inappropriate contact by teachers with female high school students; (3) Gates failed to satisfy a condition precedent to bringing suit by failing to provide notice pursuant to Kan.Stat.Ann. § 12-105b, and (4) although a former teacher at the high school had heard rumors regarding teacher Dragoo and female high school students prior to May 5, 1988, she did not report these rumors to the principal, superintendent or any board members.
 
 
 5
 Gates' basic complaint is that although the School District had no written policy authorizing, condoning or encouraging inappropriate sexual conduct between teachers and students, the defendants, by virtue of their conduct, impliedly authorized, condoned and encouraged such behavior by failing to thoroughly investigate, discipline and safeguard students from such conduct. Gates contends that such conduct became the custom or unwritten policy of the school district.
 
 
 6
 Gates' cause of action "[i]s for deprivation of the constitutional right of privacy and bodily security through the deliberate indifference and recklessness of the defendants in handling reports of prior incidents of sexual misconduct, failing to investigate other incidents and failing to remedy or safeguard students." (Appellant's Appendix, Pretrial Order, pp. 12-13). She further contends:
 
 
 7
 ... [T]he school board members acted to retain the teacher (Dragoo) with knowledge of prior instances of sexual misconduct. The vote to retain the teacher provides a direct nexus to the sexual assault since the assault never would have occurred if the teacher's contract had not been renewed under conditions and safeguards to prevent any recurrence of sexual misconduct.
 
 
 8
 Under the facts of this case, at least one (and possibly more) instances of sexual misconduct of the teacher (Dragoo) were known to the school board. The teacher continued to receive good performance reviews after knowledge of sexual misconduct occurred. The prior instances of sexual misconduct were concealed due to the claim of executive privilege by the school board.
 
 
 9
 Public officials with notice of misbehavior by their subordinates must not take actions which communicate that they encourage or condone such behavior. Stoneking, 882 F.2d at 729. Such conduct as failing to discipline or failing to safeguard against a known danger establishes an unwritten policy or custom for purposes of section 1983.
 
 
 10
 A jury question remains as to whether defendants acted with deliberate indifference or reckless disregard in voting to retain this teacher, and failing to take any corrective measure, based upon the information which they had at the time, or acquired prior to May 5, 1988.
 
 
 11
 (Appellant's Appendix, Plaintiff's Suggestions in Opposition to Defendants' Motion for Summary Judgment, pp. 60-61).
 
 
 12
 A summary review of the depositional evidence and some exhibits follows:
 
 
 13
 Donald Navinsky, a former member and president of the school board (1981-89), testified that: during the spring of 1985, the board had to determine whether to grant Dragoo tenure; Cheryl Parker was then a senior at the high school, and her father, Richard Parker, appeared before the board in executive session and, in tears, reported that Dragoo was chasing his daughter, that Cheryl was infatuated with Dragoo, and that Dragoo was the first guy who had shown any interest in Cheryl; when the board convened to determine whether to retain or terminate Dragoo, no member of the Parker family appeared, but some thirty people appeared on Dragoo's behalf; the board was divided as to whether to retain Dragoo even though no one had appeared at the meeting opposing his retention; neither Superintendent Fagan nor Principal Simmons had any knowledge of Dragoo's relationship with Cheryl Parker, except Fagan had been contacted by Cheryl's mother who indicated that Dragoo had an affair with Cheryl, which Fagan related to the board; two of Navinsky's children had attended Pleasant Ridge High School and had enrolled in Dragoo's vocational agriculture classes and considered Dragoo a very good teacher; Gail Navinsky considered Dragoo a good teacher and she had no inappropriate contact with Dragoo; Navinsky considered Dragoo an outstanding teacher, and that his class was working great; the board members were concerned that Dragoo's new program would fall on its face if the board hired a new teacher; Superintendent Fagan stated to the board that he did not have sufficient knowledge of the Dragoo-Parker relationship to permit an opinion, and Principal Simmons stated that he had heard nothing critical of Dragoo; and the board voted to retain Dragoo, 5 to 2.
 
 
 14
 Navinsky knew of no other incident beyond that involving Cheryl Parker attributable to Dragoo from 1985 until the May 5, 1988, incident involving Dragoo and Gina Gates, but he had personal suspicions of Dragoo because he believed that if Dragoo "messed up" with Cheryl Parker there was a chance that he may have done so with other high school girls; he had no concrete evidence about Dragoo's actions after the 1985 incident, but he did hear scattered comments from a high school student, Danny Langley, that Dragoo was chasing after Gina Gates; Dragoo and Cheryl Parker were married shortly after her graduation from high school; there was no question in his mind that the board would not tolerate a teacher having inappropriate contact with a student, and certainly sexual contact would be inappropriate; after Dragoo's marriage to Cheryl Parker, he asked questions about Dragoo, and while he heard some rumors, there was no information provided the board between 1985 and May of 1988 regarding any inappropriate misconduct by Dragoo.
 
 
 15
 Leslie P. Gates, father of plaintiff Gina L. Gates, testified that in November of 1990 following the May 5, 1988, incident, he attended a town meeting during which Donald Navinsky informed him that Dragoo had been involved with other female students before Dragoo pleaded guilty to assault or abuse of Gina Gates. Gates stated that he could not believe what he was hearing. He stated that since the assault, his daughter's personality had changed in that she was angry, withdrawn and cried a lot.
 
 
 16
 Gina Louise Gates, plaintiff, testified that: in 1988, she was a senior and attended Dragoo's vocational agriculture class; earlier that year, probably the middle of March, 1988, after a class, Dragoo tickled her and touched her breasts, and when she asked him to stop, he did; she did not report this incident to anyone because she was scared that it would hurt other people and she was embarrassed; she saw Dragoo tickle and "play around" with other female students but she didn't report that; on May 5, 1988, after class, she went to Dragoo's desk for help concerning a class paper, and after he helped her, Dragoo fondled her breasts; she stated that after the May 5, 1988, incident, her friend, Carmen Stillian, while then a student in the high school, told her that Dragoo had assisted her in obtaining an abortion.
 
 
 17
 Louise Lind, who taught at Pleasant Ridge High School at the same time that Dragoo taught, testified that: during the 1983-84 school year, she heard rumors that Dragoo and Gail Navinsky, then a senior, were involved; during 1984-85, Dragoo told her that he was going to the home of former student, Sandy Hopkins, and having sex with her; in late 1984, Dragoo told her that he was in love with Cheryl Parker, that he was not having sex with Cheryl, and that they were married following Cheryl's graduation; prior to May of 1988, Dragoo asked her advice relative to helping Carmen Stillian obtain an abortion; she advised Dragoo not to get involved, but shortly thereafter Dragoo told her that he had helped Carmen get an abortion; and that she did not inform the superintendent, the principal or any board members about any of these matters.
 
 
 18
 Ronald Fagan, former Superintendent of the school district, testified that: the only two incidents involving Dragoo which were brought to his attention prior to the Gina Gates incident were the Cheryl Parker case by virtue of contact made by Cheryl's father and a report from a Mrs. Kirby during the latter part of 1988 that her daughter, Alisha Kirby, had stated that Dragoo had been involved with Carmen Stillian, a student; he did not inform the board of this rumor because he had not received any complaint from Carmen Stillian and she had since moved to Texas and was not available for questioning; in 1985, he received a call from Cheryl Parker's mother who indicated that she was concerned about the relationship between her daughter and Dragoo; he notified the president of the board about the call and set the matter for discussion at the next board meeting; when the board met, no complaints were made against Dragoo by the Parkers or anyone else, while a large number of people appeared in support of Dragoo; other than the rumors involving Cheryl Parker and Carmen Stillian, he had received no complaints or reports of any inappropriate sexual contacts between any teacher and student at the high school.
 
 
 19
 Donald Simmons, former Principal of Pleasant Ridge High School, testified that: he had no knowledge that Dragoo was pursuing Cheryl Parker in 1985, he was never contacted relative thereto by Cheryl's parents, and no complaints were made to him about the matter; he received no complaints and did not hear any rumors that Carmen Stillian was involved with Dragoo or that Dragoo had assisted her in obtaining an abortion; prior to June, 1988, he had not received any negative comments about Dragoo from any students, parents or others; and that had he received a complaint that Dragoo was involved in inappropriate contact with female students, he would have taken immediate action.
 
 
 20
 Simmons stated that: he attended the executive session of the board in February, 1985, to present his evaluation of Dragoo for tenure; as a classroom teacher, Dragoo met all expectations of the school district and the students; Cheryl Parker's father, Richard, did not contact him; he had no knowledge or information that Dragoo was romantically involved with Cheryl Parker but that obviously he was because Dragoo and Cheryl were married when she was 18 years of age and that fact would not impact Dragoo's job; the board policy, adopted from the Kansas Association of School Boards, provides, in part, that "all staff members are expected to maintain relationships with members of the student body which are conducive to an effective educational environment;" in February, 1984, he submitted an evaluation of Dragoo wherein he complimented Dragoo for making the students feel important and respected, but he also noted that Dragoo should be aware that traveling to and attending activities with students could jeopardize his professional relationship with them; in 1988, Superintendent Fagan inquired about Dragoo, and he replied that he had no way of responding to rumors or innuendo and that all he could respond to were the written evaluations of Dragoo's teaching performance; and that there was never any substantiation to the board of rumors concerning Dragoo.
 
 
 21
 Simmons also stated that: he was first informed of the incident involving Dragoo and Gina Gates in late June of 1988, when he was contacted by a detective with the Leavenworth County Sheriff's Office and informed that Dragoo was under investigation; the detective asked him not to report the investigation to Superintendent Fagan, and he responded that this put him in a tough spot because these matters should be in the superintendent's hands; in early July, 1988, he notified the president and vice-president of the board about the Gina Gates incident; on July 7, 1988, he notified Superintendent Fagan that Dragoo had been arrested for inappropriate sexual contact with a student; on July 18, 1988, the board suspended Dragoo from his teaching position pending an investigation into the incident; and that on August 1, 1988, the board initiated termination proceedings against Dragoo and Dragoo surrendered his teaching certificate.
 
 
 22
 On April 7, 1989, Dragoo was convicted of the sexual battery of Gina Gates in Leavenworth District Court. Thereafter, and as a result of the board's action taken against Dragoo, the Kansas State Board of Education revoked Dragoo's teaching certificate on August 8, 1989.
 
 
 23
 Dragoo was named in a 1987 report by the Kansas Department of Social and Rehabilitation Services (SRS) alleging that he had sexually abused Christine Chapman, a student at Pleasant Ridge High School. That report was not made known to the board, the superintendent or the principal until this action was filed.
 
 
 24
 It was teacher Louise Lind who reported the sexual abuse incident involving Gina Gates and Dragoo to the SRS on May 7, 1988, after one of Gina's friends told Lind about it. Lind did not inform the superintendent, principal or any board members of the incident. A report was filed with the Leavenworth County Sheriff's Office on May 20, 1988, but Simmons knew nothing about it until he was contacted by Detective Spellman in late June, 1988.
 
 
 25
 Kan.Stat.Ann. § 72-1623 provides that the board is authorized to make all necessary rules and regulations for the government and conduct of the schools. Kan.Stat.Ann. § 72-8202b(c) provides that the superintendent of schools shall have charge and control of the public schools of the school district, subject to the orders, rules and regulations of the board. Kan.Stat.Ann. § 72-8202e authorizes the board to appoint other officers and employees of the school district, to serve at the pleasure of the board.
 
 The District Court's Memorandum and Order
 
 26
 The court found that plaintiff's claim against the defendants premised upon the existence of a custom of failure to receive, investigate, or act upon complaints of violations of constitutional rights could not withstand summary judgment because the alleged pattern of misconduct was not so " 'permanent and well settled' as to have the effect and force of law," quoting Jane Doe "A" v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir.1990) (quoting Monell v. Department of Social Serv., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). The court reasoned that in this case there is simply no evidence to substantiate the existence of a "continuing, widespread, persistent pattern of misconduct" that had been "so permanent and well settled" as to have the effect and force of law; further, even assuming that such a pattern could be established, there is no showing that the defendants had notice of it or that the purported custom was the cause or moving force behind the misconduct in this case.
 
 
 27
 As to whether a policy of the defendants exposed them to liability, the court reasoned that policy is a course of action which has been approved by the policymaking body (board) through formal policymaking procedures, citing to Harris v. City of Pagedale, 821 F.2d 499, 506 (8th Cir.), cert. denied, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987), reh'g denied, 484 U.S. 1083, 108 S.Ct. 1066, 98 L.Ed.2d 1027 (1988), constituting a deliberate choice of action with respect to the subject matter in question, citing to D.T. by M.T. v. Independent Sch. Dist. No. 16, 894 F.2d 1176, 1189 (10th Cir.), cert. denied, 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990). Reasoning that in order to hold the school district liable, plaintiff must demonstrate that the district's policy constituted deliberate indifference or reckless disregard for her constitutional rights, citing to D.T. by M.T., 894 F.2d at 1192, the court found that plaintiff had failed to demonstrate that the board had notice of a prior constitutional violation. The court stated that considering all of the facts in the light most favorable to the plaintiff, the most that could be said is that the board knew that Dragoo had been romantically involved with Cheryl Parker in that Cheryl was infatuated with Dragoo, and that Dragoo had encouraged her. The court observed that there was no complaint that Dragoo had sexually assaulted Cheryl or engaged in any sexual misconduct with her. The court found that this knowledge was simply insufficient to place the board on notice that the female students' constitutional rights to personal security and freedom from sexual assault were in jeopardy; accordingly, as a matter of law, the board did not act with deliberate indifference or reckless disregard for plaintiff's constitutional rights. Further, the court found that plaintiff failed to produce any evidence establishing a causal link between the policy in question and the constitutional deprivation, and "[I]t is a far reach even to find that the challenged policy is 'a deliberate choice of action with respect to the subject matter in question.' See D.T. by M.T., 894 F.2d at 1189 (emphasis added)." (R., Appellant's Appendix, Memorandum and Order, footnote 2, p. 248).
 
 
 28
 Having failed to produce any evidence establishing a causal nexus between the board's policy and a deprivation of plaintiff's constitutional rights, see D.T. by M.T., 894 F.2d at 1187, the court concluded that plaintiff had failed to produce sufficient evidence to raise issues of material fact with respect to the elements of her claim against the school district. Accordingly, the court deemed it appropriate to grant summary judgment on behalf of the school district.
 
 
 29
 With respect to defendant Simmons, the court reasoned that there was a serious question as to whether Simmons was the final policymaker with respect to the challenged practices, as defined by Kansas law, and whether he made any policy. But, assuming such, the court observed that plaintiff had not produced any evidence that Simmons had notice of sexual misconduct by Dragoo, or, if so, there was no evidence that Simmons implemented any plan or policy--express or implied--that authorized or approved such misconduct. Further, the court found that plaintiff had failed to establish an affirmative link between such a policy and the constitutional deprivation visited upon plaintiff, citing to D.T. by M.T., 894 F.2d at 1197.
 
 
 30
 In light of the "glaring deficiencies in proof," the district court found that it had no alternative but to enter summary judgment on behalf of defendant Simmons.
 
 Appellate Contentions
 
 31
 On appeal, Gates contends that (1) she presented sufficient evidence of a governmental custom or policy to present a genuine issue of material fact which would preclude summary judgment, and (2) she presented sufficient evidence of "notice" to present a genuine issue of material fact which would preclude summary judgment.
 
 Standard of Review
 
 32
 We review the granting of a motion for summary judgment in the same manner as the district court. Allen v. Denver Public Sch. Bd., 928 F.2d 978 (10th Cir.1991). Summary judgment is proper only where there are no genuine issues of fact and one party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1980); Fed.R.Civ.P. 56(c). And in reviewing the granting of summary judgment de novo, we must construe the evidence and draw all inferences in the light most favorable to the party resisting the motion. Anderson, 477 U.S. at 249-52, 106 S.Ct. at 2510-12. To survive summary judgment, the plaintiff must go beyond her pleadings and show that she has evidence of specific facts that demonstrates that the defendants exhibited deliberate indifference or reckless disregard. Medina v. City and County of Denver, 960 F.2d 1493, 1500 (10th Cir.1992). The party opposing summary judgment must identify facts in the record demonstrating that the case must be submitted to a jury. Anderson, 477 U.S. at 249-52, 106 S.Ct. at 2510-12; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
 
 Discussion-Conclusion
 
 33
 In order to hold the school district (board) liable in this 1983 suit, the plaintiff must establish the existence of a policy adopted by the board or the existence and maintenance of a board custom of failure to receive, investigate or act on complaints of violations of female students' constitutional rights to be free of sexual abuse at the hands of the district's employees. To establish a case based on custom, a plaintiff must prove:
 
 
 34
 (1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the school district's employees;
 
 
 35
 (2) Deliberate indifference to or tacit approval of such misconduct by the school district's policymaking officials (board) after notice to the officials of that particular misconduct; and
 
 
 36
 (3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to the board's custom and that the custom was the moving force behind the unconstitutional acts.
 
 
 37
 In order for the individual defendants to be held personally liable to the plaintiff in this § 1983 action on her custom claim, the plaintiff must prove:
 
 
 38
 (1) that the defendants received notice of a pattern of violations of female students' constitutional rights to be free of sexual abuse at the hands of the school district's employees;
 
 
 39
 (2) That the defendants displayed deliberate indifference to or tacitly authorized the unconstitutional acts;
 
 
 40
 (3) That the defendants failed to take proper remedial steps; and
 
 
 41
 (4) The defendants' failure to take proper remedial steps caused the plaintiff's injury.
 
 
 42
 Gates argues that the board received complaints of Dragoo's "inappropriate behavior" prior to the May 5, 1988, incident and that, as a result, the board and Simmons either had knowledge, or reasonably should have known[1], that Dragoo posed a threat to female students at Pleasant Ridge High School. We disagree.
 
 
 43
 The evidence in this record demonstrates that in 1985 the board and Simmons knew only that Cheryl Parker was infatuated with Dragoo and that Dragoo had encouraged her. There was no complaint that Dragoo has sexually assaulted Cheryl. We agree with the district court's conclusion that while Dragoo's conduct was obviously inappropriate, it did not rise to the level of a violation of Cheryl's constitutional right. Gates' reliance on Stoneking v. Bradford Area Sch. District, 882 F.2d 720 (3rd Cir.1989), after remand from 856 F.2d 594 (3rd Cir.1984), vacated sub. nom., Smith v. Stoneking, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), is misplaced. The court there held that the school district was liable to the plaintiff student for damages in a § 1983 action charging sexual abuse at the hands of a high school band instructor because of "their own actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct." 882 F.2d at 724-25. Unlike Stoneking, the record here reflects that the board and Simmons did not approve of inappropriate student-teacher relations and did not condone or encourage Dragoo's pursuit of such relationships. In Stoneking, the principal and/or assistant principal had received, repressed and concealed at least five complaints between 1978 and 1982, concerning sexual assaults of female students by teachers and/or staff members. The school district was found liable for the adoption and maintenance of a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by a teacher. Id. There are no such showings in the instant case.
 
 
 44
 In Ware v. Unified Sch. Dist. No. 492, 881 F.2d 906, 912-13 (10th Cir.1989), modified in part, reh'g denied in part, 902 F.2d 815 (1990), we held that in a § 1983 action against a Kansas school board (the final policymaking authority), the plaintiff must establish a direct link between the actions of the board and the alleged unconstitutional deprivation (citing City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). This can be established by showing either that the board delegated its decision-making authority to an official whose conduct caused the constitutional violation, or that the board exercised its decision-making authority with deliberate indifference to the constitutional rights of the plaintiff.
 
 
 45
 With respect to the school district's liability, we agree with the district court that the evidence would not support a finding of the existence of a pattern of persistent and widespread unconstitutional practices that had become so permanent and well-settled as to have the force and effect of law. The evidence does not demonstrate that the defendants had notice of a pattern of unconstitutional acts, or that the defendants displayed deliberate indifference or tacitly authorized the violation of plaintiff's constitutional rights. Thus, we agree with the district court's conclusion that no custom or policy of deliberate indifference to or tacit authorization of the unconstitutional conduct practiced by Dragoo could be attributed to the school district.
 
 
 46
 As to Simmons, we agree with the district court that the evidence would not support a finding that Simmons had any notice of sexual misconduct by Dragoo or that he was deliberately indifferent to or tacitly authorized Dragoo's sexual abuse of plaintiff.
 
 
 47
 A claim seeking personal liability in a civil rights suit must be predicated on the defendant actor's personal involvement; there must be an affirmative link to causally connect the actor with the alleged violation. Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Here, there is no affirmative link to causally connect either the school district or Simmons with the sexual abuse visited upon Gates by Dragoo.
 
 
 48
 In Jantz v. Muci, 976 F.2d 623 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), we recognized that, under Kan.Stat.Ann. § 72-8202c final hiring and termination authority vests in the school boards but that an absolute delegation of this authority to a principal or superintendent could give rise to "final authority" if the principal's discretion is unfettered. City of St. Louis v. Praprotnik, 485 U.S. 112, 130, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988) makes it clear that "[s]imply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy." Thus, as stated in Weimer v. Schraeder, 952 F.2d 336, 341 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3006, 120 L.Ed.2d 881 (1992), the offensive policy of the governing body must be shown to "[e]manate from an officially promulgated decision or from a practice which is well-settled and permanent," citing Monell, 436 U.S. at 691, 98 S.Ct. at 2036. See also, Summers v. State of Utah, 927 F.2d 1165 (10th Cir.1991) (must prove formal policy or informal custom which evidences a deliberate indifference to citizens' rights). We find no evidence that the Board delegated any policy-making authority to Simmons.
 
 
 49
 Here, there is no evidence of any board policy or custom which caused Gates to suffer a constitutional deprivation at the hands of Dragoo. While there may have been some negligence on the part of the board and/or Simmons in failing to adequately investigate rumors of inappropriate conduct by Dragoo, we have made it clear that liability under § 1983 must be predicated upon a "deliberate deprivation of constitutional rights by a defendant." Woodward v. City of Worland, 977 F.2d 1392, 1399, (footnote omitted) (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). See also Langley v. Adams County, Colo., 987 F.2d 1473 (10th Cir.1993) (liability of supervisor under § 1983 must be predicated on supervisor's deliberate indifference rather than mere negligence); Medina, 960 F.2d 1493 (10th Cir.1992) (an act is reckless and may state a claim under § 1983 when it reflects wanton or obdurate disregard or complete indifference to risk); Berry v. City of Muskogee, Okla., 900 F.2d 1489 (10th Cir.1990) (to prove deliberate indifference, there must be evidence demonstrating a higher degree of fault than negligence, but less than that required to demonstrate intentional and malicious intent); Ware, 902 F.2d at 912-13 (deliberate indifference to the constitutional rights of those affected by board's decisions); D.T. by M.T., 894 F.2d at 1194 (evidence was insufficient to establish that school district's policy of investigation, hiring and supervising teachers was so wanting that it constituted deliberate indifference or reckless disregard for the constitutional rights of the plaintiffs).
 
 
 50
 We AFFIRM.
 
 
 
 [1]
 We note that this court has previously rejected the argument that § 1983 liability can attach where the defendant "should have known" of the unconstitutional behavior. Woodward v. City of Worland, 977 F.2d 1392, 1399 n. 11 (10th Cir.1992). Instead, the scienter requirement of § 1983 requires at least a showing of "a conscious acceptance of a known risk" or recklessness. Id. (quoting Archuleta v. McShan, 897 F.2d 495, 499 (10th Cir.1990)