FILED
United States Court of Appeals
Tenth Circuit

January 4, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

KRISTINE ROST, as parent and next friend of K.C., a minor,

Plaintiff - Appellant,

v.

STEAMBOAT SPRINGS RE-2 SCHOOL DISTRICT,

Defendant - Appellee.

No. 06-1518

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 04-cv-2302-RPM)

Jack D. Robinson of Spies, Powers & Robinson, P.C., Denver, Colorado, for Plaintiff - Appellant.

William Stuller (Kristin C. Edgar, on the brief), of Caplan and Earnest, L.L.C., Boulder, Colorado, for Defendant - Appellee.

Before **KELLY**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiff-Appellant Kristine Rost, as next friend of her minor daughter,

K.C., appeals the district court's grant of summary judgment in favor of

Defendant-Appellee Steamboat Springs School District RE-2 ("school district" or "district") on her claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, and 42 U.S.C. § 1983 for allegedly violating K.C.'s rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment.  Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

K.C. was enrolled in Steamboat Springs Middle School as a seventh-grader in August 2000.  She received special education and related services pursuant to the Individuals with Disabilities Education Act, due to an early-childhood brain injury.

Beginning in seventh grade and continuing to eighth grade, K.C. was coerced into performing various sexual acts with a number of boys including Steven Thomas, Nick Mangione, Alex Church, and Thomas Barnes ("the boys") who were all named as individual defendants in the complaint.  The boys persistently and continuously pestered her for oral sex, calling her "retard" and stupid, threatened to spread rumors to her peers that she frequently engaged in sexual conduct with others, and threatened to distribute naked photographs of her. A police report indicates that the incidents occurred in a variety of private locations and social settings, and a few of the incidents appeared to be "consensual."

Ms. Rost did not know of the sexual harassment until K.C. told school officials on January 16, 2003. However, Ms. Rost urged school officials to talk to K.C. during the spring and fall of 2002 because she suspected that something was wrong with K.C. In the spring of 2002, Ms. Rost first became concerned about K.C. because K.C. did not want to attend school anymore. Her mother repeatedly pleaded with school counselor Margie Briggs-Casson to find out what was bothering K.C. She also spoke with Tim Bishop, principal of the middle school, regarding her concerns about K.C. and what she perceived as Ms. Briggs-Casson's lack of responsiveness. She also told Principal Bishop that the boys had tried to break into her home looking for pain medication. At some point, Ms. Briggs-Casson spoke with K.C., and K.C. told her about the harassment saying that "these boys were bothering me," but at that time, K.C. did not know to use the word assault and did not describe the incidents in more specific terms.

In the fall of 2002, K.C. began her freshman year at the Steamboat Springs High School and the harassment continued. Ms. Rost told David Schmidt, principal of the high school, that K.C. said the boys were bothering her and calling her retarded, she hated school and was afraid to go to school, she was afraid to go to a math class in which Steven Thomas was enrolled, and having an aide with her in class caused the boys to tease her. After a series of meetings, Ms. Rost and Principal Schmidt determined that the aide would sit in the back of the math class instead of beside K.C. Neither Ms. Rost nor school officials knew

- 3 -

at that time of any sexual harassment of K.C.

On January 16, 2003, K.C. disclosed to Ann Boler, a counselor at the high school, that Steven Thomas was repeatedly calling her to ask for oral sex. She also disclosed that Steven Thomas and Nick Mangione previously coerced her into sexual conduct by threatening to show others naked pictures of her and spread rumors about her. Ms. Boler could not locate the principal or vice-principal, so she immediately contacted Officer Jason Patrick, the school resource officer. Officer Patrick questioned K.C. in Ms. Boler's office for approximately one to two hours. Ms. Boler later informed Principal Schmidt, and together with Officer Patrick, then informed Ms. Rost of K.C.'s disclosures.

Principal Schmidt decided that because none of the incidents occurred on school grounds and the incidents occurred before any of the students were enrolled in high school, Officer Patrick would investigate the sexual assaults. As a result, Principal Schmidt and the school district did not otherwise investigate the assaults. However, Principal Schmidt did maintain daily contact with Officer Patrick regarding the investigation, and the district assisted him in arranging interviews with the students during the investigation.

The investigation was hampered by Ms. Rost's refusal to communicate (or allow K.C. to communicate) further with the school or law enforcement regarding the incident on the advice of counsel. Based on Officer Patrick's report, the district attorney declined to prosecute the case on the rationale that it would be

- 4 -

difficult to prove that the activity was not consensual and the trial would expose K.C. to tremendous trauma.

A couple weeks after reporting the abuse to Ms. Boler, K.C. suffered an acute psychotic episode that required hospitalization. Following K.C.'s discharge from the hospital in February 2003, Ms. Rost met with school officials to discuss educational alternatives for K.C. Ms. Rost accepted an offer for a private tutor but declined any option that required K.C. to return to the high school. The following year, as part of a mediation between Ms. Rost and the district regarding educational alternatives for K.C., an independent educational evaluation was conducted which suggested that K.C. attend a different school from Steamboat Springs High School. In the summer of 2004, K.C. suffered two additional acute psychotic episodes, probably as a result of the assaults; one in Chicago during a visit to her sister, and another in Steamboat Springs just before moving to Carbondale, Illinois.

Ms. Rost, as K.C.'s next friend, filed suit against the school district alleging violations under Title IX and under 42 U.S.C. § 1983 for violations of the Due Process and Equal Protection clauses of the Fourteenth Amendment that the district has a custom of acquiescing to student-on-student sexual harassment and created a dangerous educational environment. Ms. Rost also sued the four boys alleging various state law tort claims. The district court granted summary judgment for the district on the federal claims, and dismissed the pendent state

law claims without prejudice.

On appeal, Ms. Rost argues that the district court improperly granted summary judgment on whether the school district had actual knowledge of the sexual harassment and was deliberately indifferent to reports of sexual harassment. She maintains that material issues of fact exist regarding whether the district had an established policy or custom of acquiescing to student-on-student sexual harassment, thereby exposing it to liability under the Fourteenth Amendment, and that the district created a dangerous educational environment for K.C. in violation of 42 U.S.C. § 1983.

## Discussion

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1112–13 (10th Cir. 2007). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the facts in the light most favorable to the non-moving party. Scott v. Harris, 127 S. Ct. 1769, 1774 (2007).

I. Title IX claim

Ms. Rost alleges that a genuine issue of fact remains regarding Title IX

liability for student-on-student sexual harassment endured by K.C. because the district had actual knowledge of the sexual harassment and was deliberately indifferent to those reports. The district argues that there is no evidence that the district had actual knowledge of the sexual harassment before January 16, 2003. And once the district received the notice, it thoroughly investigated the allegations and worked with Ms. Rost to provide K.C. educational alternatives.

Title IX provides, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A school recipient of federal funds may be liable under Title IX for its own conduct in being deliberately indifferent to student-on-student sexual harassment. Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 643 (1999). A school district may be liable under Title IX provided it (1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school. Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1246 (10th Cir. 1999).

A. Actual knowledge

We recognize that district courts differ as to whether notice of prior complaints as opposed to notice of the current harassment for which redress is sought triggers liability under Title IX. See Escue v. N. Okla. College, 450 F.3d

1146, 1153 (10th Cir. 2006). In Escue, we found that the plaintiff had not met the more permissive standard (notice of prior complaints) and did not resolve the issue. See id. We need not resolve this issue in this case because Ms. Rost only argues that, under her Title IX claim, the district had actual notice of the specific harassment of K.C.

Ms. Rost claims that the district received actual notice of the sexual harassment of K.C. on two separate occasions—in the spring of 2002 and in the fall of 2002. The district court held that K.C.'s complaints that boys were "bothering her" as relayed to the district were insufficient to constitute actual notice of sexual harassment, and that, in the absence of anyone knowing that the sexual harassment was occurring, a negligent failure to investigate Ms. Rost's generalized complaints did not result in Title IX liability. We agree.

K.C. testified in a deposition that she told Margie Briggs-Casson in the spring of 2002 about the assaults, but at that time, she did not know to use the word assault. When asked what she told Ms. Briggs-Casson, K.C. stated, "That these boys were bothering me and no one understood me in town." K.C.'s statement that the boys were bothering her was insufficient to give the district notice that she was being sexually harassed. Although Ms. Rost suggests that the district court mischaracterized the deposition testimony and failed to consider ambiguities in the light most favorable to her, Aplt. Br. at 15, Aplt. Reply Br. at 1–3, no fair reading of the deposition testimony would establish that the school

district had actual notice of the harassment based on K.C.'s generalized complaints.

Ms. Rost testified that she repeatedly pleaded with the counselor, Ms. Briggs-Casson, to find out what was bothering K.C. All Ms. Rost knew was that K.C. hated school and did not want to attend anymore, but K.C. would not tell her why. Ms. Rost also spoke with Principal Bishop regarding her concerns for K.C. and regarding Ms. Briggs-Casson's lack of responsiveness. However, Ms. Rost was unable to provide the school officials with any specifics because she did not know why K.C. was withdrawing as K.C. refused to speak to her mother about the harassment. Ms. Rost's concern for K.C. and complaints about Ms. Briggs-Casson did not give the district actual notice of the sexual harassment.

Ms. Rost also points to Mr. Reynolds' testimony as evidence that K.C. told Ms. Briggs-Casson that the boys were sexually harassing her. Mr. Reynolds was K.C.'s therapist during the spring of 2004, and he testified in a deposition that K.C. told him that she told Ms. Briggs-Casson "about the coerced sexual activity with the boys." Mr. Reynolds "questioned that somewhat" because had that disclosure occurred "it would be beyond [his] comprehension" that Ms. Briggs-Casson would not have reported it to law enforcement or social services. Mr. Reynolds fully admitted that he "wasn't privy to the conversation" between K.C. and Ms. Briggs-Casson, that he "didn't know any of the details," and "never discussed it with [Ms. Briggs-Casson]." We need not resolve the difficult

question of whether this oblique testimony is admissible under a hearsay exception. Mr. Reynolds' testimony does not create a genuine issue of material fact because K.C. testified as to what she told Ms. Briggs-Casson. Her deposition testimony clarifies that she told Ms. Briggs-Casson about the sexual harassment using the words "these boys were bothering me" without further elaboration. Mr. Reynolds' testimony adds nothing because it simply does not address the manner in which K.C. conveyed her predicament to Ms. Briggs-Casson. Although Ms. Rost suggests that we read more into the testimony of K.C. and Mr. Reynolds, we may not disregard the plain tenor of what K.C. said when directly asked about this issue. Thus, while it is tragic that K.C. did not clearly communicate that she was being sexually harassed in the spring of 2002, K.C.'s statement to Ms. Briggs-Casson that "these boys [are] bothering me" was insufficient to give actual notice of the sexual harassment.

The second time frame in which Ms. Rost alleges the district received actual knowledge of the sexual harassment was in the fall of 2002. Ms. Rost points to her testimony that she met with Principal Schmidt early in the fall of 2002 and expressed these concerns: K.C. was afraid to attend her math class; K.C. did not want an aide in the math class anymore; and K.C. said that the boys were bothering her. Ms. Rost was unable to communicate more specifically to Principal Schmidt K.C.'s concerns because she had no additional information from K.C. As a result of these meetings, Ms. Rost and school officials decided to

have the aide sit in the back of the class. Neither the school district nor Ms. Rost knew at that time that K.C. was being sexually harassed. As a result, the district did not receive actual notice of any sexual harassment during those meetings in the fall of 2002.

B. Deliberate indifference

It is undisputed that K.C. disclosed the sexual harassment to Ms. Boler on January 16, 2003, and that this disclosure gave the district actual notice of the harassment. The next question we must answer is whether the school district was "deliberately indifferent to acts of harassment of which it ha[d] actual knowledge." Murrell, 186 F.3d at 1246; Davis, 526 U.S. at 644–45. We need not respond to Ms. Rost's argument that the district was deliberately indifferent in its response to the harassment prior to K.C.'s January 2003 disclosure as we have concluded that the district had no knowledge of the harassment until January 2003. Ms. Rost also argues that the district's response to the notice of the harassment in January 2003 was clearly unreasonable because the district failed to investigate the allegations, interview the alleged perpetrators and the victim, and appropriately discipline the boys involved. She contends that this deliberate indifference deprived her of an equal educational opportunity after January 2003, as her medical providers advised her not to return to Steamboat Springs High School. Aplt. Reply Br. at 14. Ms. Rost's arguments are without merit.

A district is deliberately indifferent to acts of student-on-student

- 11 -

harassment "only where the [district's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. Here, once K.C. disclosed the sexual harassment to Ms. Boler, Ms. Boler immediately contacted Officer Patrick, the school resource officer, who questioned K.C. about the harassment. Principal Schmidt determined that because he believed none of the incidents occurred on school grounds and the incidents occurred before any of the students were enrolled at the high school, Officer Patrick should investigate the sexual assaults. Officer Patrick continually interacted with the school to arrange for the interviews of the students. Principal Schmidt had approximately fifty conversations with Officer Patrick regarding the investigation and received a copy of Officer Patrick's report. Though Officer Patrick testified that he might have been initially vague with the school district and not kept it totally involved because he viewed his investigation as separate, he also testified to his interaction with the district. We do not think that the district can be faulted for letting Officer Patrick take the lead in this very serious situation. Officer Patrick and the school reasonably believed that the harassment occurred away from school, and criminal charges were a possibility. The district's response was not clearly unreasonable as school officials immediately contacted law enforcement officials, cooperated fully in the investigation, and kept informed of the investigation. The district reasonably could believe it did not have responsibility or control over the incidents, and merely because the

principal thought that the school could discipline students for conduct occurring

outside the school grounds says nothing about whether it was appropriate given

what occurred here.  See Davis, 526 U.S. at 645 (noting harassment creating

liability under Title IX "must occur 'under' 'the operations of' a funding

recipient, . . . [meaning that] the harassment must take place in a context subject

to the school district's control") (quoting 28 U.S.C. § 1681(a); § 1687).[1]  This is

not a situation where a school district learned of a problem and did nothing.  See

Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 262 (6th Cir. 2000)

(school district only spoke to the supposed perpetrators after a female student was

intentionally and repeatedly sexually harassed); Murrell, 186 F.3d at 1243–44

(teachers did not inform the plaintiff's parent of sexual assaults on plaintiff at

school and did not inform law enforcement, investigate, or discipline the

offending student).  Rather, given a complicated situation involving the rights of

many parties including the alleged perpetrators, the school district deferred to law

---

[1]  We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX.  Davis suggests that there must be some nexus between the out-of-school conduct and the school.  See 526 U.S. at 645.  We do not find a sufficient nexus here, where the only link to the school was an oblique and general reference to harassment or teasing on the school bus or in the halls at school.  Moreover, the fact that the boys threatened to post pictures of K.C. at school does not cause the harassment to "take place in a context subject to the school district's control" either.  See id.  The district's decision to refer the investigation of the harassment to law enforcement officials where the harassment occurred off school grounds and often while the students were not enrolled in school was not clearly unreasonable under the facts of this case.

enforcement.

We agree with the concurring and dissenting opinion that school districts should not solely rely on a prosecutor's discretion not to prosecute a sexual harassment case when responding to claims of sexual harassment. However, here the district relied on more, namely, that there were problems of proof in determining which conduct was not consensual and the fact that the police report described other admittedly consensual conduct. Such reliance was not clearly unreasonable. Of course the district would not need to prove malfeasance beyond a reasonable doubt, but a school district would not be deliberately indifferent making a judgment that it would be daunting to sort out the wrongdoing on such conflicting facts, especially when the victim is unwilling to provide clarifying details to school officials.

Ms. Rost argues that the district violated its sexual harassment policy by not interviewing the boys involved. The policy does state that an administrator should interview the alleged offender and victim to determine whether harassment occurred; then if harassment did occur, the administrator will determine the appropriate discipline, including reporting the incident to law enforcement. Here, the district presumed that harassment occurred based on K.C.'s report and immediately contacted law enforcement. Perhaps the district should have independently interviewed the boys involved instead of relying on Officer Patrick's investigation and periodic reports, but such an allegation would sound in

negligence, not deliberate indifference.  See Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 174 (1st Cir. 2007) (noting "[i]n hindsight, there may be other and better avenues that the [district] could have explored . . . [b]ut Title IX does not require . . . flawless investigations [or] perfect solutions"); Bd. of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 407 (1997) (noting "[a] showing of simple or even heightened negligence will not suffice" under the deliberate indifference standard).

Regarding the failure to interview K.C., both the district and Officer Patrick were unable to further interview K.C. regarding the harassment because Ms. Rost was advised by counsel to not allow anyone, neither the police department nor the school, to talk to K.C. about the harassment and assaults even when Officer Patrick explained that criminal charges were unlikely if he could not further interview K.C.  Since Ms. Rost prevented any additional interviews, she cannot now claim that the district's failure to further interview K.C. constitutes deliberate indifference.

Finally, it was not clearly unreasonable that the district did not discipline the boys involved.  Ms. Rost seems to argue that the district should have expelled the four boys so that K.C. could return to school.  However, the Supreme Court has noted that schools need not expel every student accused of sexual harassment to protect themselves from liability, and "victims of peer harassment [do not] have a Title IX right to make particular remedial demands."  Davis, 526 U.S. at

648. The standard is not that schools must "remedy" peer harassment, but that they "must merely respond to known peer harassment in a manner that is not clearly unreasonable." Id. at 648–49.

Many factors in the record counseled caution in determining whether discipline was appropriate in this case, and the district's judgment call not to pursue discipline was not clearly unreasonable and deliberately indifferent. Principal Schmidt determined that discipline was not appropriate in this case since most of the incidents did not occur on school grounds, and the district reasonably could believe it did not have responsibility or control over the incidents. See Davis, 526 U.S. at 645. Officer Patrick's investigation and the district attorney's assessment concluded that it would be difficult to prove that the conduct was not consensual. Officer Patrick and Principal Schmidt were unable to further investigate the harassment because Ms. Rost and K.C. refused to communicate with them on the advice of counsel. It would be difficult to discipline students where it was unclear which, if any, conduct was consensual and where the victim refuses to clarify details of the incidents. Cf. Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 610 (8th Cir. 1999) (holding a district not liable under Title IX where the district investigated allegations of sexual misconduct and initiated discipline only once the district obtained conclusive proof of the relationship). The Supreme Court has noted that administrators need not "engage in particular disciplinary action" under Title IX, but only respond in

a manner that is not clearly unreasonable. Davis, 526 U.S. at 648–49. In addition, we are discouraged from second-guessing school disciplinary decisions. Id. at 648.

Further, Ms. Rost does not contend that further sexual harassment occurred as a result of the district's deliberate indifference after K.C.'s disclosure in January 2003. See Escue, 450 F.3d at 1155–56. The Supreme Court has stated that in the case where a district does not engage in the harassment directly, as here, "it may not be liable for damages unless its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." Davis, 526 U.S. at 644–45 (quotations and alterations omitted). We acknowledge that our sister circuits have rejected a strict causation analysis which would absolve a district of Title IX liability if no discrimination occurs after a school district receives notice of discrimination. See, e.g., Fitzgerald, 504 F.3d at 172 (citing cases that conclude that a single incident of pre-notice harassment may be enough for Title IX liability). Similarly, the Eleventh Circuit has held that Title IX discrimination can occur even after a student withdraws from school where the university fails to timely respond or take precautions to prevent further attacks. Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1297 (11th Cir. 2007).

Here the district 's response did not cause K.C. to undergo harassment or

make her liable or vulnerable to it.  See Davis, 526 U.S. at 645.  Unlike the situation in Williams, the district took steps to prevent further harassment of K.C. by working with Ms. Rost to find safe educational alternatives for K.C.  The district here reacted similarly to the school district in Fitzgerald, which promptly commenced an extensive investigation and offered to provide the victim remedial measures.  See 504 F.3d at 173–75.  The fact that Ms. Rost rejected the alternatives the district provided and did not allow K.C. to return to school does not reflect on the appropriateness of the district's response and Ms. Rost does not allege any deficiency in the district's efforts in this regard.

The concurring and dissenting opinion argues that the district's failure to expel the boys kept K.C. from returning to school.  The record does not support this assertion.  The record suggests that Ms. Rost would not have allowed K.C. to return to any school in the district under any circumstances.  In meetings with school officials, Ms. Rost would only consider private tutoring, which the district provided, or out-of-state boarding schools.  She applied to at least two out-of-state private schools and was accepted to one but K.C. did not attend because of lack of funding.  The family then moved to another state.  There is no evidence in the record that Ms. Rost was willing to work with school officials and allow K.C. to return to the school under some accommodation.  Ms. Rost considered all other options offered by the district as inappropriate and refused them.  If K.C. had expressed interest in returning to the school and school officials had not provided

a safe educational environment, then she would likely have a Title IX claim. But that is not this case.

Though the facts in this case are tragic, we think the response of the district must be evaluated against a backdrop of the possible. The district's response was not clearly unreasonable so as to be deliberately indifferent to the harassment. Accordingly, we conclude that summary judgment was appropriate on the Title IX claim.

II. Equal Protection Claim

Ms. Rost also argues that the district had an established custom of acquiescing to student-on-student sexual harassment by not enforcing its sexual harassment policy which makes it liable under 42 U.S.C. § 1983, depriving K.C. of her constitutional right to equal protection of the laws under the Fourteenth Amendment. The district court granted summary judgment for the district on this claim, concluding that the two specific incidents of sexual harassment do not create an issue of material fact. We agree.

The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A denial of the equal protection of the laws under color of state law is actionable under 42 U.S.C. § 1983. Sexual harassment by a state actor may violate the equal protection clause. Starrett v. Wadley, 876 F.2d 808, 814 (10th Cir. 1989).

A school district's liability for sexual harassment under the Equal Protection clause is analyzed under a municipal liability framework. See, e.g., Murrell, 186 F.3d at 1249–50. A claim of municipal liability for sexual harassment requires that the state employee's discriminatory conduct be representative of an official policy or custom of the institution, Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 690–91 (1978), or are taken by an official with final policymaking authority, Pembaur v. City of Cincinnati, 475 U.S. 469, 484–85 (1986) (plurality opinion). In the absence of an official policy, a municipality may be still be liable for the widespread and persistent practice of sexual harassment which constitutes a custom. Starrett, 876 F.2d at 820.

Ms. Rost does not contend that the district had an official policy or that a decision was made by an official with final policymaking authority. She only contends that the district had a custom of acquiescing to student sexual harassment. Ms. Rost's argument appears to fit within the caselaw analyzing the custom of failure to receive, investigate, or act on complaints of constitutional violations. Under this precedent, a plaintiff must prove (1) a continuing, widespread, and persistent pattern of misconduct by the state; (2) deliberate indifference to or tacit authorization of the conduct by policy-making officials after notice of the conduct; and (3) a resulting injury to the plaintiff. See Gates v. Unified Sch. Dist. No. 449 of Leavenworth County, Kan., 996 F.2d 1035, 1041

(10th Cir. 1993); see also P.H. v. Sch. Dist. of Kansas City, Mo., 265 F.3d 653, 658–59 (8th Cir. 2001).

Ms. Rost points to admissions by Principal Schmidt and Principal Bishop that there have been complaints of sexual harassment in the past. She also points to discipline of one of the co-defendants Nick Mangione for sexual harassment. But the evidence that Ms. Rost identifies actually shows that the district is not acquiescing to the sexual harassment. As Ms. Rost notes, the district involved the police department in some of the harassment complaints and disciplined Nick Mangione. In addition, the high school conducted a survey to determine the scope of the sexual harassment problem. The evidence does not show that there was a widespread and persistent practice of failing to respond to student sexual harassment. At best, the evidence shows that the district was aware of several discrete problems and was working to remedy them—which only raises an issue of the district's negligence, not its deliberate indifference. The attempted remedial measures suggest the district was not deliberately indifferent to or tacitly approving of the misconduct. See Gates, 996 F.2d at 1041–42.

Ms. Rost also argues that the district consistently failed to follow its sexual harassment policy but does not provide evidence of occurrences where the district failed in this regard. Generalized allegations are insufficient to create an issue of material fact at the summary judgment stage. Fed. R. Civ. P. 56(e). Therefore the evidence is insufficient to show that the district had a custom of acquiescing

to student sexual harassment, and the district court's grant of summary judgment on Ms. Rost's equal protection claim is affirmed.

III.  Due Process claim

Ms. Rost also urges that the district created a dangerous educational environment for K.C. and that a state may be liable for the acts of third parties where the state created the danger that caused the harm.  Normally, state actors are liable only for their own acts, and not the violent acts of third parties. Liebson v. N.M. Corrections Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "As a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). Although "[the Due Process Clause] forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."  Id. at 195.

There are two exceptions to this general rule.  First, the special relationship doctrine "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual."  Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003) (quotations omitted). Second, the danger creation theory provides "a state may also be liable for an individual's safety if it created the danger that harmed the individual."  Id.

(quotations omitted).  Ms. Rost only alleges that the district created the danger that harmed K.C. under the second exception.

A danger creation claim must meet a six-part test: (1) the state entity and individual actors created the danger or increased the plaintiff's vulnerability to the danger; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious and known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, shocks the conscience.  Christiansen, 332 F.3d at 1281.  Regarding the necessary culpability, the Due Process clause only protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995).

Ms. Rost argues that the district's failure to address K.C.'s disabilities and its failure to follow or enforce its sexual harassment policy created a dangerous environment for K.C.  Specifically, Ms. Rost claims that the school's failure to remove K.C. from a remedial math class that one of the co-defendants, Steven Thomas, also attended created a dangerous environment for K.C.  Even viewing this evidence in the light most favorable to Ms. Rost, there is no genuine issue of fact that the district created the danger that caused the harm.

The record is clear that when Ms. Rost met with Principal Schmidt to discuss K.C. and her math class, Ms. Rost told Principal Schmidt that K.C. did

not want to attend the class anymore because the boys were bothering her and she did not like having an aide with her. Ms. Rost's concerns were that K.C. said she did not want to attend school because she hated it and was afraid of attending. However, neither Ms. Rost nor any district employee knew that K.C.'s concerns were due to sexual harassment. At most, the facts allege that the district may have been negligent in not more appropriately addressing K.C.'s disabilities and in allowing her to remain in the class. However, negligent government conduct is insufficient to prove liability under § 1983. Christiansen, 332 F.3d at 1281; Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996); Uhlrig, 64 F.3d at 573. Similarly, Ms. Rost's allegation that the district failed to appropriately follow and enforce its sexual harassment policy sounds in negligence, not deliberate misconduct. Because the district lacked knowledge of any risk of danger to K.C., Ms. Rost has not shown the district has the necessary culpability to survive summary judgment on her due process claim. We therefore affirm the district court's grant of summary judgment on this claim as well.

AFFIRMED.

*Rost v. Steamboat Springs Sch. Dist.*, 06-1518. **McCONNELL**, J., concurring in part and dissenting in part.

K.C., a young teenager with learning disabilities, was coerced into performing oral sex on a number of boys who were fellow students at her middle school. Although most of this activity (and all of the actual sexual contact) took place outside of school, she was mercilessly teased at school, the boys threatened to spread rumors about her and to circulate naked pictures of her around the school, and on at least one occasion she was importuned for sex on the school bus. School authorities took no effective remedial measures. Eventually, two weeks after her most explicit complaint to the school, she suffered a series of psychotic episodes, probably caused by the assaults, and on advice of her psychiatrist withdrew from school. Her mother brought suit on her behalf against the school district for its failure to respond, claiming that K.C. was "on the basis of sex, . . . excluded from participation in . . . [an] educational program or activity receiving Federal financial assistance," in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).[1] The most important matters in dispute are whether school authorities had actual knowledge of the sexual harassment in the spring of 2002 and whether, after January 2003, when they certainly had actual knowledge, they acted with deliberate indifference,

---

[1] The plaintiff also asserted claims under the Fourteenth Amendment. I agree with the majority that those claims were properly dismissed on summary judgment.

effectively causing her exclusion from school. Because the case was dismissed on summary judgment, we ask only whether, drawing all reasonable inferences in favor of the plaintiff, the plaintiff has raised a disputed question of material fact regarding these issues.

## I. Actual Knowledge In Spring, 2002

While it is a close call, I agree with the majority that the school district did not have actual knowledge of the sexual harassment of K.C. until January 16, 2003. By her own admission, K.C.'s conversation with her counselor, Margie Briggs-Casson, in the spring of 2002, did not make clear that the harassment she was undergoing was sexual in nature. K.C. told the counselor "[t]hat these boys were bothering me and no one understood me in the town." App. 183. The following exchange ensued at her deposition:

Q You never told Margie [the counselor] that the boys were forcing you to perform oral sex on them, right?

A Yes, I did.

Q Did you use those words?

A No, I didn't know those words then.

Q Okay. And –

A But I put it in my own words at the time.

Q Okay. And those words were that boys were bothering you?

A Yeah.

*Id*. at 184.

The exchange is disturbing because K.C. was attempting to communicate what was happening to the counselor but did not have the words. One would think a trained middle school counselor, faced with a mildly retarded young student who was severely distressed about being "bothered" by some boys in her class, would ask the obvious follow-up question—in what way are they bothering you?—especially since one of the boys had previously been disciplined for engaging in sexual harassment. However, nothing in the record suggests that any such follow-up occurred, and the plaintiff apparently did not take the counselor's deposition to find out why not. (At least, no such deposition is in the record.) On these facts, to impose liability on the school district would effectively hold it responsible for what it "'should have known' about harassment but failed to uncover and eliminate." *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 282 (1998). That is not the duty imposed by Title IX, which is solely to respond to sexual harassment of which school officials have "actual knowledge." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). *See generally Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1174–77 (10th Cir. 2007).

## II.  Deliberate Indifference After January 16, 2003

The defendants concede, and the majority agrees, that the school district gained actual knowledge of the harassment on January 16, 2003.  But the majority affirms the district court's grant of summary judgment in favor of the defendants on two grounds: first, that the district's response was not clearly unreasonable; second, that even if unreasonable, it did not cause K.C. any legal harm.  I respectfully dissent on both points.

### A. The School District's Inaction Was Not Reasonable

Promptly upon hearing K.C.'s account of the boys' treatment of her, the high school counselor contacted Jason Patrick, a police officer assigned to the school as a "resource officer," to investigate the incidents.  He promptly interviewed K.C. about the incidents, and then questioned many of K.C.'s friends as well as the boys involved.  He prepared a 14-page written report, which was presented to the school principal.  (K.C.'s mother was urged to read the report, but declined to do so.)  The report confirmed many of the sexual acts and other misconduct about which K.C. complained.  Officer Patrick also talked to the school principal some fifty times about the progress of the investigation.  Based on Officer Patrick's report and those conversations, the principal became convinced that K.C. was sexually harassed by the boys.  Officer Patrick also forwarded the report to District Attorney Bonnie Roesink, who decided not to file

-4-

criminal charges. Ms. Roesink explained that "the State would not be able to prove beyond a reasonable doubt that the activity . . . was not consensual. While unfortunate that these incidents occurred, I do not believe that we would be able to meet our burden of proof in a trial setting." Further, a trial would "expos[e K.C.] to . . . tremendous trauma." App. 212.

Upon learning that the harassment of K.C. would not be criminally prosecuted, the school district did nothing more. By the principal's own admission in deposition, neither the school nor the school district performed any additional investigation; the principal did not even speak with the boys regarding their misconduct; and none of the boys was disciplined in any way. The district's entire response to the sexual coercion and harassment that caused K.C. to leave school was to refer the issue to a police officer and then to do nothing when no charges were filed.

The plaintiff complains both of the school district's failure to engage in its own investigation and of its response. I agree with the majority that the decision to rely on Officer Patrick to conduct the investigation was reasonable. He was a member of the school staff; he was apparently well-qualified to conduct an investigation into conduct that had evident criminal implications; his report appears thorough—and confirmatory of K.C.'s complaints; and he communicated frequently with the school principal as the investigation proceeded. Even if there might have been some better way to conduct the investigation (and plaintiff does

-5-

not explain why any alternative would have been better), no reasonable jury could find the investigation a sign of deliberate indifference.

The school district's inaction after receiving the report, however, was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. At this point, the school principal no longer had any doubt that the harassment had occurred and that it was predicated, at least in part, on sex, and therefore within the ambit of Title IX. Having read Officer Patrick's report, the principal knew of its frequency and severity. The principal knew the names of the boys involved. One of the malefactors had committed acts of sexual harassment at school before. Yet the school district did absolutely nothing. No discipline. No counseling. No communications with the boys' parents. The principal did not even call the perpetrators into his office for an admonitory chat. This cannot be a reasonable response. *See Escue v. N. Okla. College*, 450 F. 3d 1146, 1155 (10th Cir. 2006) ("[A] minimalist response is not within the contemplation of a reasonable response." (internal quotation marks omitted)).

It is a bit unclear why the majority concludes that this total inaction was reasonable under the circumstances. The majority first embraces the defendants' argument that "discipline was not appropriate in this case since most of the incidents did not occur on school grounds, and the district reasonably could believe it did not have responsibility or control over the incidents." Maj. Op. 16. Either the majority has set the bar for legal responsibility on the part of the school

district too high as a matter of law or it has failed to view the evidence in the light most favorable to the plaintiff.

The majority concedes, in a footnote, that it is not true that "harassment occurring off school grounds cannot *as a matter of law* create liability under Title IX." *Id.* at 13 n.1.[2] But it makes no attempt to delineate the reach of the school district's potential liability in the context of this case, or determine whether the district's legal responsibility extends to some (even if not all) of the boys' misconduct.

According to the Supreme Court, the proper inquiry is whether the school district "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. As of January, one of the boys, Nick Mangione, was enrolled in the high school. Steven Thomas, who was perhaps the most egregious offender, was enrolled in the high school but had not been attending since November, 2002, for reasons unknown to the school authorities. Thomas Barnes, a year younger, was still at the middle school but would attend the high school the following year. Alex Church never attended the high school; the record does not reflect whether he attended a school operated by the district. Although one of the reasons Principal Schmidt gave in his deposition for taking no disciplinary action was that "[m]any of the situations after finding

---

[2]In *Simpson*, a public university was held responsible under Title IX for sexual assaults that occurred in the victim's apartment. 500 F.3d at 1180.

out did not take place at our school," App. 210, he also stated:

> Q.   Is it your understanding as the principal of the high school that the high school can discipline students for conduct outside of school grounds.
>
> A.   Yes, yes.
>
> Q.   Statutorily, they can?
>
> A.   Yes.

*Id.*

The principal thus did not assert that he lacked the statutory authority to impose discipline in this context.  He defended his inaction, instead, on three more specific discretionary grounds: (1) that the only harasser then attending the high school, Nick Mangione, was the least culpable of the four; (2) that the Patrick report said that the sexual acts were "consensual" and that the prosecutor was not going to pursue the matter criminally; and (3) that he did not "have any information directly" from K.C. or her mother.  App. 210.  He did not claim there was nothing more the school had authority to do.  On this record—particularly bearing in mind that it must be read in the light most favorable to the plaintiff—there exists at least a disputed question of material fact regarding the reach of the school district's control over the situation.

Moreover, while the actual sexual assaults in this case did not happen at school, much of the harassment did.  The plaintiff's evidence shows that the boys repeatedly pestered K.C. for sex (including at least once on the school bus), that

they "were harassing her on the bus, [and] in the halls . . . at school," App. 169, and threatened to spread sexual rumors and naked photographs of her around the school. Her treatment in middle school had been so bad that she was afraid to go to math class. These claims are supported by more than "oblique and general references" in the record (Maj. Op. 14 n.1); they are documented in the plaintiff's deposition testimony and her complaints to the school counselor, and in many cases are confirmed by the police report. It is true that when she was in middle school, the district did not know that this in-school harassment was sexual in nature and thus was under no Title IX obligation to act. But after January 16 the defendants had the full story. Even if the after-school assaults themselves were beyond its jurisdiction, the school district was not entitled to ignore the in-school harassment, making no attempt to bring it to a halt.

The majority also finds it reasonable "that the school district deferred to law enforcement." Maj. Op. 14; *see also id.* at 16 ("Principal Schmidt determined that discipline was not appropriate in this case since . . . Officer Patrick's investigation and the district attorney's assessment concluded that it would be difficult to prove that the conduct was not consensual." ). But a school district's responsibilities to its students are not coterminous with a prosecutor's judgments about what cases to bring in court. The prosecutor did not conclude that the sex acts in which K.C. engaged were in fact "consensual" (whatever that might mean for a girl of her age and mental condition), but only that it was unlikely that the

state could "meet [its] burden of proof in a trial setting." App. 212. School discipline is not a trial setting. Student misconduct need not be established beyond a reasonable doubt.

Moreover, even assuming the boys had committed no prosecutable criminal acts, that does not mean they did not engage in sexual harassment. Principal Schmidt admitted in his deposition that he believed that K.C. was sexually harassed.[3] That is what matters under Title IX. For purposes of Title IX, it is wholly irrelevant whether she was also the victim of criminal assault. A great deal of harassment falls short of the criminal; that does not mean a school with actual knowledge of harassing conduct is free to ignore it.

The majority also suggests that the school district's inaction is excused by the fact that Ms. Rost and K.C. retained a lawyer and did not speak to the district after K.C.'s two-hour interview with Officer Patrick. I admit this gives me pause. It is difficult for school officials to work out a reasonable response to a student's problems when her mother prefers to protect her position in a future lawsuit rather than discuss what happened and what should be done. But schools have legal and pedagogical obligations even when their students' families are unhelpful or litigious. By the time the family's lawyer shut down communication, K.C. had

---

[3] This case is thus distinguishable from *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir. 1999), on which the majority relies. In that case, the school did not act because it had insufficient evidence that misconduct had occurred. Here, after receiving Officer Patrick's report, the principal entertained no doubt that K.C. had been sexually harassed.

-10-

already talked to Officer Patrick for about two hours and had given him numerous details of what had happened to her. The family's subsequent silence did not prevent the school from taking appropriate measures.

The majority also emphasizes that "administrators need not 'engage in any particular disciplinary action' under Title IX." Maj. Op. 17 (quoting *Davis*, 526 U.S. at 648–49). The school was not necessarily required by federal law to expel the boys from school. A broad range of lesser measures might well be appropriate responses to a situation like this. If the school had undertaken any disciplinary measures, or attempted to ensure that K.C. could return to school without further harassment, it might well have satisfied its obligation. However, Title IX does not allow a school district, without justification, to decide that harassment must be met with criminal prosecution or nothing.

### B. The Unreasonable Response Excluded K.C. From School

The majority also holds that even if the school district's non-response was unreasonable, the district is not liable because K.C. suffered no more harassment after she left school on January 16, 2003. This misunderstands Title IX. Title IX forbids a school district from "exclud[ing]" students on the basis of their sex. 20 U.S.C. § 1681(a). A district is liable for student-on-student sexual harassment that "effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Thus, if the district's deliberate indifference to

-11-

K.C.'s sexual harassment is responsible for her decision, on advice of her psychiatrist, not to return to the school, the district is liable for illegally excluding her.

The majority states that "the district's response did not cause K.C. to undergo harassment or make her liable or vulnerable to it." Maj. Op. 18. But the reason K.C. did not undergo additional harassment is that she never went back to school. Moreover, there is evidence from which a jury could infer that the school's non-response to the boys' sexual harassment is what kept her away. K.C.'s psychiatrist advised Ms. Rost that it was important "to help [K.C.] find a safer environment, especially considering that if she goes back to the exact same high school, she will be around [the boys.]" R. 310. When asked why she had refused to send K.C. back to school, Ms. Rost testified that she was relying on the psychiatrist's recommendation not to return. The majority is therefore wrong to conclude that "Ms. Rost would not have allowed K.C. to return to any school in the district *under any circumstances*," Maj. Op. 16 n.2 (emphasis added). The record suggests that it was the undeterred presence of the boys that kept K.C. from returning to school.

The fact that K.C. was not harassed after leaving the school does not entitle the district to summary judgment. It is true that in *Davis* the Supreme Court said that, to create liability, "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it," *Davis*,

-12-

526 U.S. at 645, but that comment must not be taken out of context. *Davis* elaborated the further-harassment requirement in explaining that it was "not *necessary* . . . to show physical exclusion to demonstrate that students have been deprived [of their rights.]" *Id.* at 651. *Davis* never suggested that exclusion would not be *sufficient* to create liability and indeed said that "[t]he most obvious example of student-on-student sexual harassment capable of triggering a damages claim would . . . involve the overt, physical deprivation of access to school resources." *Id.* at 650.

If a school's unreasonable inaction in response to sexual harassment makes further harassment reasonably certain, it would make no sense to impose liability only if a student returned for more abuse, but not if she stayed away and was effectively "excluded from participation" in school. 20 U.S.C. § 1681(a).

### III. Conclusion

There are genuine disputes of material fact as to the reasonableness of the school's response and K.C.'s consequent exclusion from Steamboat Springs High School. I would therefore reverse the district court's grant of summary judgment on that ground.