# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 14, 2013

Lyle W. Cayce
Clerk

No. 11-51067

ANDRICKA STEWART,

Plaintiff – Appellant

v.

WACO INDEPENDENT SCHOOL DISTRICT,

Defendant – Appellee

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

Plaintiff-Appellant Andricka Stewart appeals from the district court's dismissal of her civil-rights action against Defendant-Appellee Waco Independent School District (the "District"). She seeks review only of her claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Because Stewart states a claim under one theory of liability, we REVERSE and REMAND for proceedings consistent with this opinion.

No. 11-51067

## I. Facts and Procedural History

Because this appeal arises from a dismissal for failure to state a claim, we presume the truthfulness of well-pled allegations. *See, e.g., Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). This court reviews such cases *de novo*, construing facts "in the light most favorable to the non-movant." *Ill. Cent. R.R. Co. v. Cryogenic Transp., Inc.*, 686 F.3d 314, 316 (5th Cir. 2012) (citation omitted). "Dismissal [is] appropriate if [the plaintiff] fail[s] to allege facts supporting a plausible claim or fail[s] to raise her right to relief above a speculative level." *Id.* (citation omitted).

As alleged in her first amended complaint: Stewart "suffers from mental retardation, speech impairment, and hearing impairment" and qualifies as a person with a disability under the Americans with Disabilities Act and the Rehabilitation Act. During the relevant time period, Stewart attended A.J. Moore Academy, then a District high school, as a special-education student. After an incident involving sexual contact between Stewart and another student in November 2005, the District modified Stewart's Individualized Education Program ("IEP") to provide that she be separated from male students and remain under close supervision while at school.

Nonetheless, the complaint alleges that Stewart was involved in three other instances of sexual conduct, which she characterizes as "sexual abuse," over the next two years.[1] In February 2006, a male student sexually abused Stewart in a school restroom. The District concluded that Stewart "was at least somewhat complicit" in the incident and suspended her for three days. In August 2006, school personnel allowed Stewart to go to the restroom unattended, and she was again sexually abused by a male classmate. Finally, in October 2007, a male student "exposed himself" to Stewart. The District suspended her

---

[1] The District disputes whether the incidents qualify as sexual abuse under Texas law.

No. 11-51067

again. In none of these instances, according to Stewart, did the District take any steps to further modify her IEP or to prevent future abuse.[2]

Stewart sued the District in state court, and the District removed on federal-question grounds.[3] Relevant here, Stewart brings a claim under the Rehabilitation Act for the District's alleged "gross mismanagement" of her IEP and failure to reasonably accommodate her disabilities. She asserts that the suspensions meted out after the second and fourth incidents deprived her of educational benefits.

The district court dismissed Stewart's action in its entirety, concluding that her claims under § 504, the ADA, and Title IX failed because they attempted to hold the district liable for "the actions of a private actor."[4] Stewart filed a motion to reconsider, which the district court denied in a single-page order. She timely appealed.

On appeal, Stewart borrows from Title IX case law and contends that she can state a claim under § 504 for the District's deliberate indifference to disability-related student-on-student sexual assault, in addition to "gross mismanagement" of her IEP. She also characterizes her claim as one based on the District's "fail[ure] to provide her with the necessary accommodations to

---

[2] Stewart generically alleges that she "has a history of being harassed by other students due to her disability, including intimidation by other students, physical assaults, being beat up, and having other kids call her names." She contends that her grandmother put District officials on notice of these incidents, to no avail.

[3] Stewart's filed her complaint almost three years from the final instance of alleged sexual abuse to file suit. The District pled limitations as an affirmative defense in its answer, but it has not raised the issue here, and we express no opinion on it.

[4] Stewart's complaint and the progression of the case at the district court level focused on § 1983 claims premised on substantive due process violations under state-created-danger and special-relationship theories. We note that the district court's dismissal of those claims is supported by our subsequent opinion in *Doe ex rel. Magee v. Covington County School District ex rel. Keys*, 675 F.3d 849, 854-66 (5th Cir. 2012) (en banc). Stewart does not challenge this portion of the district court's judgment.

No. 11-51067

prevent repeated sexual abuse by her peers" and "plac[ing] her in a dangerous environment by failing to adhere to its own prescribed accommodations intended to protect her."[5]

The District responds with three general arguments. It first contends that Stewart pleads no facts connecting the alleged sexual abuse solely to her disability. The District next argues that it was not deliberately indifferent because it investigated the alleged incidents and took action that it deemed appropriate under the circumstances. This argument notes that Stewart failed to directly allege that her disabilities contributed to the conduct underlying the two suspensions. Finally, the District asserts that Stewart fails to state a claim that the District acted in bad faith or with "gross misjudgment." In the District's opinion, Stewart has essentially packaged a dispute over its legitimate disciplinary and educational decisions as a civil-rights action.

## II. Guiding Principles

Section 504 provides that "no otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

---

[5] Stewart also suggests that the District violated § 504 by virtue of the suspensions. By itself, though, discipline of a special-needs student is not a violation of § 504. The law is clear that a school district may discipline a special-education student like any other student—even with removal from her normal educational environment—so long as the predicate incident is not a "manifestation" of the student's disability. *See, e.g.*, *S-1 v. Turlington*, 635 F.2d 342, 346-49 (5th Cir. Unit B 1981), *abrogated on other grounds by Honig v. Doe*, 484 U.S. 305, 317 (1988)); *Doe ex rel. Gonzales v. Maher*, 793 F.2d 1470, 1482 (9th Cir. 1986) ("When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children."); *see also Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 465 (4th Cir. 2012) ("A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability."). Stewart fails to plead that she was disciplined for conduct attributable to manifestations of her disabilities or to describe how her disabilities manifest themselves in the educational environment.

4

assistance . . . ." 29 U.S.C. § 794(a). This court has reviewed § 504 claims under the standard applicable to claims arising under the ADA. *See, e.g., D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) (citing, *inter alia, Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272 (5th Cir. 2005) (en banc)). "To establish a prima facie case of discrimination under the ADA, [a plaintiff] must demonstrate: (1) that she is a qualified individual within the meaning of the ADA; (2) that she was excluded from participation in, or was denied benefits of, services, programs, or activities for which [the school district] is responsible; and (3) that such exclusion or discrimination is because of her disability." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 292 (5th Cir. 2012) (unpublished) (citing *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)). "The only material difference between the two provisions lies in their respective causation requirements." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citation omitted). Section 504 prohibits discrimination "solely by reason" of a disability, whereas the ADA applies even if discrimination is not "'the sole reason' for the exclusion or denial of benefits." *Id.* (citation omitted).

Because § 504 and the ADA focus on discrimination, students with disabilities may use them to supplement avenues of recovery available under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq. See D.A.*, 629 F.3d at 453 (citing *Marvin H. v. Austin Indep. Sch. Dist.*, 714 F.2d 1348, 1356 (5th Cir. 1983)). "[T]o establish a claim for disability discrimination, in [the] educational context, 'something more than a mere failure to provide the "free appropriate education" required by [the] [IDEA] must be shown.'" *Id.* at 454 (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982)) (last alteration in original). A plaintiff instead must "'allege that a school district has *refused* to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program.'" *Id.* (quoting *Marvin H.*, 714

No. 11-51067

F.2d at 1356). This may be shown by "facts creating an inference of professional bad faith or gross misjudgment." *Id.* at 455. Allegations that educational authorities "'exercised professional judgment,'" even mistakenly, do not suffice unless they "'depart grossly from accepted standards among educational professionals.'" *Id.* at 454-55 (quoting *Monahan*, 687 F.2d at 1171); *cf. Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) ("[T]he decision, if made by a professional, is presumptively valid . . . .").

### III. Stewart Fails to Plead Student-on-Student Harassment

Stewart does not appeal the dismissal of her Title IX claim. She instead argues that she may state a § 504 claim under a theory of liability analogous to that applied to student-on-student sexual harassment claims under Title IX, given the two statute's similar operative language. *See Brown v. Sibley*, 650 F.2d 760, 767 (5th Cir. Unit A 1981) (noting similarities). The Sixth Circuit has deployed that approach in education-related § 504 cases. *See, e.g.*, *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453-56 (6th Cir. 2008). Such analysis appears consonant with a bad-faith and gross-misjudgment standard,[6] and also comports with the high standard applied in the context of a state actor's liability for constitutional claims based on third-party harms. *See, e.g.*, *Covington*, 675 F.3d 849.

We need not decide the viability of such a cause of action here. Even if Stewart's Title IX-like theory of disability discrimination is actionable, she fails to plead facts sufficient to state such a claim. Plaintiffs may premise a Title IX claim against a school district based on student-on-student sexual harassment where the district "acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis*, 526 U.S. at 633; *see also id.* at 641 (noting

---

[6] The Eighth Circuit has briefly considered a § 504 claim apparently brought under a Title IX theory of liability under a bad-faith and gross-misjudgment analysis. *See Bradley v. Ark. Dep't of Educ.*, 301 F.3d 952, 956 (8th Cir. 2002).

that this "hold[s] the [state actor] liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools").

The standard applied to such claims, however, is exceedingly high. "Deliberate indifference is an extremely high standard to meet" in and of itself. *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). It "generally requires that a plaintiff demonstrate 'at least a pattern of similar violations.'" *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (citation omitted). A discrimination claim based on student-on-student harassment requires even more: the "action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. That is, a school district's "response to the harassment or lack thereof [must be] clearly unreasonable in light of the known circumstances," *id.* at 648, such that the district's actions subjects the victim to further discrimination. *Id.* at 649; *see also Williams v. Bd. of Regents*, 477 F.3d 1282, 1296 (11th Cir. 2007) (holding that *Davis* requires plaintiffs to "allege that the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination," an element not present in pleading deliberate indifference in municipal-liability cases).

Stewart's complaint falls short of this stringent standard.[7] We assume without deciding that the abuse here qualifies as severe, pervasive, and objectively offensive behavior that effectively excluded Stewart from equal access

---

[7] We may ascertain the unreasonableness of a school district's actions from the pleadings. *See Davis*, 526 U.S. at 649 ("This is not a mere 'reasonableness' standard, as the dissent assumes. In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." (internal citation omitted)).

No. 11-51067

to educational opportunities.[8]    The complaint's largely cursory allegations, however, provide little information on the "'constellation of surrounding circumstances, expectations, and relationships'" necessary to determine whether the District's responses were "clearly unreasonable" under the circumstances.

The complaint fails to address the harassers' identities and relationship to Stewart, the punishments meted out to the harassers, the nature of the abuse, the names and responsibilities of District personnel with knowledge of the harassment, the time-delay between the abuse and the District's response, the extent of Stewart's harm and exclusion from educational opportunities,[9] the specific reasons why the District's responses were obviously inadequate, or the manner in which such responses likely made Stewart susceptible to further discrimination. Courts have found these factors, among others, relevant in the context of student-on-student harassment under Title IX. *See, e.g.*, *Davis*, 526 U.S. at 651-53; *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 364-65 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 282 (Oct. 1. 2012); *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122-24 (10th Cir. 2008); *Porto v. Town of Tewksbury*, 488 F.3d 67, 73-76 (1st Cir. 2007); *Williams*, 477 F.3d at 1295-99; *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1287-89 (11th Cir. 2003); *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817,

---

[8] *See Davis*, 526 U.S. at 650-51 (using, as an example of qualifying misconduct, deliberate indifference to "overt, physical deprivation of access to school resources," such as "a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource"); *id.* at 652-53 (requiring that the "behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity" and be "played out on a 'wide-spread level' among students").

[9] Stewart mentions the two in-school suspensions, but these were only wrongful if they were based on conduct attributable to manifestations of her disabilities. She instead asserts that the suspensions were inappropriate because "she was only a freshman and was mentally retarded." Compl. ¶ 15. This says only that Stewart was young and that she had a disability, facts insufficient without more to permit the inference that the District was clearly unreasonable in disciplining her.

8

823-25 (7th Cir. 2003); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259-63 (6th Cir. 2000); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247-49 (10th Cir. 1999).

The paucity of Stewart's complaint, moreover, contrasts to the detailed allegations made in other cases decided at the motion-to-dismiss stage. *See Davis*, 526 U.S. at 633-35; *Williams*, 477 F.3d at 1288-91; *Murrell*, 186 F.3d at 1243-44 (student with disabilities). Stewart pleads four instances of abuse, to which the District responded initially by implementing IEP modifications and on two occasions by determining that Stewart was "complicit" in the misconduct and suspending her. We know little about the District's response to the third incident. Stewart complains that the District failed to modify her IEP and to eliminate future harassment, but she gives no explanation as to what actions were taken, even as she omits any suggestion that the District did nothing. In the absence of allegations relevant to at least some of the factors listed above, we are asked to infer that the District's responses were clearly unreasonable because it disciplined Stewart and the abuse did not end after the first three incidents.[10]

But, "the fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [the district] at the time." *Porto*, 488 F.3d at 74; *see also Hawkins*, 322 F.3d at 1287 ("[W]hether the [school] Board's actions were clearly unreasonable must be measured by what was known."). *Davis* specifically counsels against requiring that districts must "purg[e] their schools of actionable peer harassment or that administrators must engage in

---

[10] The reasonableness of the District's response may depend, for example, on whether Stewart was abused by the same student or whether the harassers understood the "severity and offensiveness of their actions," *Gabrielle M.*, 315 F.3d at 823, which they might not if they were students with certain types of disabilities.

particular disciplinary action[s]" in order to avoid being deliberately indifferent. 526 U.S. at 648. Indeed, school districts have no obligation to accede to "particular remedial demands," and "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*; *see also Gabrielle M.*, 315 F.3d at 824-25. Yet, that is essentially what Stewart asks us to do, even while many facts crucial to her claim remain within her knowledge, but unpled. *See Gabrielle M.*, 315 F.3d at 824-25 ("All that [the plaintiff] denies is the *remedial effect* of these steps, claiming that . . . [the harasser] continued to bother her. . . . . [The plaintiff] misunderstands the law.").

Even so, the complaint as it stands allows us to conclude that this is not a case where the school district responded "by merely investigating and absolutely nothing more." *Vance*, 231 F.3d at 260, 261-62 (affirming jury verdict for student on Title IX peer-harassment claim where the school district responded to years of repeated, escalating, and serious incidents of sexual harassment by merely "talking" to the harassers); *see also Williams*, 477 F.3d at 1296-97 (reasoning that rape victim sufficiently pled deliberate indifference where the university waited eight months to hold a disciplinary hearing and eleven months to implement "corrective actions," despite identifying the rapists as other students within days of the incident and having actual knowledge that the victim would not return to school so long as the rapists remained on campus); *Murrell*, 186 F.3d at 1247-49 (concluding that a high school student capable of functioning at only a first-grade level sufficiently pled deliberate indifference under Title IX by alleging that she was subjected to a month-long pattern of severe sexual assault, that specific school personnel had actual knowledge of the incidents but refused to discipline the harasser or inform the student's mother, and that the principal retaliated against the mother's complaints by suspending the disabled student, despite the student having

suffered psychological harm requiring her hospitalization and assignment to home-bound services).

Accordingly, although the District's responses may leave something to be desired, the complaint provides insufficient facts to plausibly state that the District's responses were so clearly unreasonable as to rise to the level of deliberate indifference to actionable student-on-student harassment under *Davis*. *Compare Porto*, 488 F.3d at 74 (ruling that school district was not deliberately indifferent because remedial efforts to keep the victim and harasser separated occasionally proved ineffective; school district's failure to assign an aide to accompany victim to the bathroom "suggest[ed] only that [the district] may have been negligent"), *with Doe ex rel. A.N. v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 49 (2d Cir. 2006) (unpublished) (affirming jury verdict against school district in part because the jury reasonably could have concluded that the district was deliberately indifferent in waiting five weeks to take "concrete action" against student rapists who continued to harass the victim on a daily basis).

We believe this conclusion hews more faithfully to deliberate-indifference principles than the "inadequate" or "ineffective" response standard suggested in *Vance*, 231 F.3d at 261 ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."). The ineffectiveness of a school district's actions may serve as a factor tending to show deliberate indifference under certain circumstances.[11] In light of *Davis*'s teaching, however, it cannot end the inquiry, even at the pleading stage. *See Porto*, 488 F.3d at 74 ("The test for whether a school should be liable . . . for student-on-student harassment is not one of effectiveness by

---

[11] As we discuss below, ineffectiveness or inadequacy is highly relevant to the gross-misjudgment inquiry.

hindsight."). It also matters that the deliberate-indifference principles at play in a Title IX mode of analysis derive directly from those well-established in the § 1983 context. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998). Indeed, *Vance* acknowledges this doctrinal lineage and cites precedent holding that deliberate indifference requires knowledge of and an unreasonable response to "'a substantial risk of serious harm.'" 231 F.3d at 260 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)).

Stewart pleads no facts showing that the District knew its responses to each incident created an obvious and substantial risk of recurring abuse, and municipal-liability precedent precludes equating negligence with deliberate indifference. *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 388 n.7 (1989) (distinguishing "gross negligence" from "deliberate indifference"); *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." (citation omitted)); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (deliberate indifference not shown by "'[m]ere negligence, neglect or . . . malpractice'" (citation omitted)). Accordingly, Stewart does not state a § 504 claim for deliberate indifference to student-on-student harassment.

## IV. Stewart's Claim for Gross Misjudgment Survives

Stewart may nonetheless state a § 504 claim based on the District's alleged refusal to make reasonable accommodations for her disabilities. Given the dearth of case law directly addressing this issue, we explain in detail below some considerations relevant to such claims.

### A. Gross Misjudgment and Reasonable Accommodations

We begin by clarifying that bad faith or gross misjudgment are just alternative ways to plead the refusal to provide reasonable accommodations, an ambiguity potentially left open by our precedent in this area. *See D.A.*, 629 F.3d

at 454-55 (noting this circuit's "long-established rule" requiring a plaintiff to show that a district "*refused* to provide reasonable accommodations,'" but also considering whether the plaintiff showed bad faith or gross misjudgment (citation omitted)); *Marvin H.*, 714 F.2d at 1356 & n.13 (rejecting plaintiff's § 504 claim because the case did "not involve a *refusal* to provide services[,] but rather a disagreement over the correctness of the services provided"). In this view, it is immaterial whether the District explicitly refused to make reasonable accommodations; professionally unjustifiable conduct suffices.

A contrary interpretation would limit § 504 claims only to where a school district literally refuses to make an accommodation. Although such cases are clear violations of § 504,[12] situations may arise where a district's course of action goes strongly against the grain of accepted standards of educational practice in ways that have nothing to do with affirmatively refusing a reasonable accommodation. For example, a district may exercise gross misjudgment in departing from an accommodation shown to be effective for a particular student in favor of a practice that achieves far less favorable outcomes, but nonetheless persists in the latter approach without adequate justification. *Cf. Patterson v. Hudson Area Schs.*, 551 F.3d 438, 448 n.7 (6th Cir. 2009) ("[I]t is undisputed that

---

[12] *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (holding, in a case presenting extreme allegations of misconduct, that plaintiff stated § 504 claims where she alleged a school district refused to provide her with "the home instruction necessitated by her disability" and to "evaluate [her] and to place her appropriately according to her evaluation"); *Smith ex rel. Townsend v. Special Sch. Dist. No. 1*, 184 F.3d 764, 769 (8th Cir. 1999) (rejecting § 504 claim in part because nothing suggested that the district "had the chance to formulate [an IEP] and failed to do so" (citation omitted)); *see also M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 982 (8th Cir. 2003) (*M.P. I*) ("One could therefore find that the District acted in bad faith or with gross misjudgment on the basis of its failure to return M.P.'s mother's repeated phone calls regarding the safety of her son, the school administrators' proposals to either drastically alter M.P.'s school day or send him to an alternative school for behaviorally troubled students, and the District's assurance that it could cover the costs of M.P.'s transportation to the Northfield School District, and rescission of that offer once M.P. had enrolled in Northfield."); *cf. Sellers ex rel. Sellers v. Sch. Bd.*, 141 F.3d 524, 529 (4th Cir. 1998) (affirming dismissal of a § 504 claim that alleged nothing more than a "failure to timely assess and diagnose").

[the district] was fully aware that use of the resource room in eighth grade impacted the amount of harassment that [the student] suffered and discontinuing the resource room in ninth grade correlated with a return to high levels of harassment. Thus, a reasonable jury could find that [the district] knew how to combat the harassment . . . and simply chose not to implement that known method of success.").

Notably, a plaintiff also may plead gross misjudgment by alleging that a school district knew of his disabilities but failed to investigate disability-based discrimination and harassment complaints or to "take appropriate and effective remedial measures once notice of [the] harassment was provided to school authorities." *M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865, 868 (8th Cir. 2006) (*M.P. II*). In sum, a school district refuses reasonable accommodations under § 504 when it fails to exercise professional judgment in response to changing circumstances or new information, even if the district has already provided an accommodation based on an initial exercise of such judgment.

### *B. Distinguishing Gross Misjudgment from Deliberate Indifference*

As the above discussion suggests, the gross-misjudgment inquiry borrows from deliberate-indifference doctrine. We emphasize, however, that the two theories are distinct. Deliberate indifference applies here only with respect to the District's alleged liability for student-on-student harassment under a Title IX-like theory of disability discrimination. *See, e.g.*, *Davis*, 526 U.S. at 648. On the other hand, "gross misjudgment"—a species of heightened negligence—applies to the District's refusal to make reasonable accommodations by further modifying Stewart's IEP, a claim traditionally cognizable in some fashion via the IDEA, the ADA, and the Rehabilitation Act. *See Sellers ex rel. Sellers v. Sch. Bd.*, 141 F.3d 524, 529 (4th Cir. 1998) (explaining that a gross-misjudgment standard applies where "plaintiffs allege a [§] 504 violation in the education context on the basis of negligence" (citing *Monahan*, 687 F.2d at

No. 11-51067

1170)).[13] We adopted the gross-misjudgment approach in *D.A.*, 629 F.3d at 454-55.[14]

Thus, although the inquiries have much in common, whether the District's actions were "clearly unreasonable" with respect to peer-occasioned disability harassment remains analytically separate from whether it acted with gross misjudgment as measured by professional standards of educational practice. *Compare Davis*, 526 U.S. at 648-53 (Title IX liability for student-on-student sexual harassment obtains only when the harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."), *with D.A.*, 629 F.3d at 454-55 (The "'exercise[ of] professional judgment'" is sufficient unless it "'depart[s] grossly from accepted standards among educational professionals.'" (citation omitted)). Maintaining the distinction between these two separate claims comports with the Supreme Court's observation in *Davis* that the relationship between the harasser and the victim to some degree controls a

[13] *See also Cnty. Sch. Bd. v. A.L.*, 194 F. App'x 173, 182 n.10 (4th Cir. 2006) (unpublished) ("[A] failure to provide an appropriate IEP under the IDEA would not, in and of itself, establish discrimination under the Rehabilitation Act, absent some evidence of 'bad faith or gross misjudgment' on the part of the school authorities." (citations omitted)); *Shirey ex rel. Kyger v. City of Alexandria Sch. Bd.*, 229 F.3d 1143, *4-5 (4th Cir. 2000) (table) (unpublished) (same); *Jeremy H. ex rel. Hunter v. Mt. Lebanon Sch. Dist.*, 95 F.3d 272, 278-79 (3d Cir. 1996) (discussing interplay of IDEA, ADA, and Rehabilitation Act); *cf. K.R. ex rel. Riley v. Sch. Dist. of Phila.*, 373 F. App'x 204, 207-08 (3d Cir. 2010) (unpublished) (construing, in jury charge context, a claim that the school district failed to "'take[] more or different measures to protect [the student] from the alleged student-on-student harassment'" to sufficiently explain the concept of "reasonable accommodation").

[14] The dissenting opinion contends that gross-misjudgment sets an unacceptably low bar for § 504 liability, but that is an issue over which this panel has no control given *D.A.*'s prior endorsement of *Monahan*. Our precedents, in any case, explain the difference between gross negligence—from which gross misjudgment derives—and deliberate indifference. "Although these terms are sometimes used interchangeably, 'gross negligence' and 'deliberate indifference' involve different degrees of certainty, on the part of an actor, that negative consequences will result from his act or omission. Whereas the former is a 'heightened degree of negligence,' the latter is a 'lesser form of intent.'" *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 n.7 (5th Cir. 1994) (en banc) (citation omitted).

15

No. 11-51067

school district's liability for the harassment. *See Davis*, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment.").

### *C. Stewart's Gross-Misjudgment Claim*

Returning to this dispute, the District insists that Stewart's complaint itself shows that the three additional incidents of sexual abuse do not state a gross-misjudgment claim. The District observes that § 504 does not "creat[e] 'general tort liability for educational malpractice,'" *D.A.*, 629 F.3d at 454, and notes that the three additional incidents occurred over a time period spanning eighteen months.[15] The District also relies on the fact that it investigated the alleged incidents, contending that its responses prove that it was not deliberately indifferent. These arguments urge an impermissibly cramped view of the District's obligations under § 504.

We have likened the effort to provide reasonable accommodations to an exercise in "bilateral cooperation." *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145 (5th Cir. 1982) (Title VII context). The "obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the [plaintiff] asks for a different accommodation or where the [defendant] is aware that *the initial accommodation is failing and further accommodation is needed.*" *Humphrey v. Mem. Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001) (emphasis added).

Thus, however appropriate the District's initial response, it had an ongoing responsibility to calibrate Stewart's IEP to effectively address the

---

[15] February and August 2006, and October 2007.

behaviors it intended to prevent by keeping her separated from males and under close supervision. Under § 504, it is not enough that the District might have discharged its duty under a deliberate-indifference standard by taking remedial—but inadequate—action. *See M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 982 (8th Cir. 2003) (*M.P. I*) (Deliberate indifference "is irrelevant if it can be shown that the District acted in bad faith or with gross misjudgment."). At this early stage, we conclude that even if the District provided Stewart with reasonable accommodations when it initially modified her IEP, the three subsequent instances of alleged sexual abuse could plausibly support a finding that the modifications were actionably ineffective.[16]

Thus, on the record as it currently stands without the benefit of further discovery, we conclude that Stewart plausibly states a claim that the District committed gross misjudgment in failing to implement an alternative approach once her IEP modifications' shortcomings became apparent. She alleges that she was sexually abused on campus on three separate occasions after the District initially modified her IEP. Regardless of what role Stewart allegedly played in facilitating this misconduct, her IEP was designed to prevent such encounters, and Stewart can plausibly argue at this stage that its effective implementation would have obviated any need for discipline.[17] The complaint also contains

---

[16] There is much we do not know at this juncture. As counsel observed at oral argument, it is unclear from the complaint whether the three additional incidents may be attributed to isolated and unrelated events or to a more widespread practice of disregarding Stewart's IEP. The closer the facts are to the latter, the more likely it is that the District exercised gross misjudgment in managing Stewart's IEP.

[17] It therefore makes no difference to this claim whether Stewart explicitly pled that she was suspended for conduct that could be characterized as a manifestation of her disabilities, such as hypersexuality or a unique susceptibility to sexual abuse. Thus, the district's argument that Stewart does not allege that the sexual abuse was "solely" caused by her disability misses the mark. Stewart's gross misjudgment claim can survive at this early stage if it plausibly alleges that the District's gross mismanagement of her IEP—not the sexual abuse it allegedly allowed—was solely related to her disablity.

allegations that the District knew of specific aspects of the alleged abuse that could have given rise to further modifications. For example, the first two additional instances both involved Stewart's use of the restroom and effectively occurred only three months apart, assuming an intervening three-month summer break, supporting a plausible argument that the District could have modified Stewart's IEP to prohibit her from going to the restroom unattended. It is plausible that failing to further modify an IEP in such circumstances grossly departs from standard educational practice.

We caution that this opinion should not be read to make school districts insurers of the safety of special-needs students. We emphasize that courts generally should give deference to the judgments of educational professionals in the operation of their schools. *See, e.g.*, *Davis*, 526 U.S. at 648. This opinion neither alters that default rule nor lowers the high standards plaintiffs must satisfy to impose liability against school districts. Isolated mistakes made by harried teachers and random bad acts committed by students and other third-parties generally will not support gross-misjudgment claims. At this stage in the case, we cannot say definitively that this case involves only the latter.

Just as a pattern of constitutional violations increases the likelihood that a state actor has been deliberately indifferent, a district's continued use of ineffective or inadequate methods when confronted with multiple instances of a specific type of misconduct becomes less defensible over time. At some point, the failure to act appropriately becomes "'such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Monahan*, 687 F.2d at 1171 (quoting *Youngberg*, 457 U.S. at 323). Given the repeated and specific instances of sexual misconduct here, whether and at what point the District crossed that line is a question better reevaluated after

18

No. 11-51067

discovery.  For pleading purposes,  Stewart's gross-misjudgment theory raises more than a speculative claim for relief.

## V. Stewart Need Not Have Exhausted Administrative Remedies

Before concluding, we address the dissenting opinion's contention—unaddressed by either party's briefs—that Stewart's claims necessarily fail because she did not exhaust them through the IDEA's administrative scheme.  The dissenting opinion correctly observes that plaintiffs must administratively exhaust certain non-IDEA claims so long as they "seek[] relief that is also available under" the IDEA.  20 U.S.C. § 1415(l).  Similarly, we agree that merely demanding monetary damages—which are unavailable under the IDEA—does not automatically remove a claim from the IDEA's ambit.  *See, e.g.*, *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 873-74 (9th Cir. 2011) (en banc) (noting that the First, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits all hold that a plaintiff cannot avoid IDEA exhaustion simply by seeking damages), *cert. denied*,132 S. Ct. 1540 (Feb. 21, 2012); *Polera v. Bd. of Educ.*, 288 F.3d 478, 483-86 (2d Cir. 2002) (drawing same conclusion from, *inter alia*, Fourth and Eighth Circuit case law).  The IDEA makes "available" myriad remedies through its "related services" provision—many fairly characterized as compensatory—that go beyond day-to-day learning accommodations.[18]  *See Charlie F. ex rel. Neil F. v. Bd. of Educ.*, 98 F.3d 989, 992-93 (7th Cir. 1996).  Plaintiffs therefore generally cannot insulate claims for monetary damages from administrative review by "artful pleading" if the damages would be used to obtain the same compensatory or other services "also available under" the IDEA.

---

[18] *See* 20 U.S.C. § 1401(26)(A) ("The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including . . . psychological services, physical and occupational therapy, recreation, including therapeutic recreation, . . . counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education . . . .").

19

No. 11-51067

*See Payne*, 653 F.3d at 875 (describing three situations in which administrative exhaustion applies); *cf. Charlie F.*, 98 F.3d at 991 (construing "'relief available' to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers").

Ultimately, we disagree with the dissenting opinion for two reasons. As an initial matter, the District arguably forfeited administrative-exhaustion arguments. It failed to raise the issue on appeal or in its motion-to-dismiss briefing before the district court. Indeed, although the District pled IDEA exhaustion as an affirmative defense, it expressly disclaimed Stewart's eligibility for IDEA relief in its first motion to dismiss.[19] Despite this, the dissenting opinion addresses administrative exhaustion *sua sponte*.[20] The only basis for doing so would have to be an implicit conclusion—unstated and unexamined—that the IDEA considers the issue jurisdictional.[21] Our sister

---

[19] Specifically, the District observed: "Clearly, Plaintiff has not pled for any relief that is available for any alleged IDEA violation."

[20] We previously have cautioned against raising affirmative defenses *sua sponte*. *See Warnock v. Pecos Cnty.*, 116 F.3d 776, 778 (5th Cir. 1997) (*res judicata* context); *cf. Carbe v. Lappin*, 492 F.3d 325, 328 (5th Cir. 2007) (recognizing, in PLRA context, that exhaustion is an affirmative defense that "is waived if not asserted," unless the complaint facially shows the plaintiff failed to exhaust (citing *Jones v. Bock*, 549 U.S. 199 (2007))). Stewart pled that she is exempt from administrative exhaustion on futility grounds. *See Honig v. Doe*, 484 U.S. 305, 327 (1988).

[21] The Supreme Court recently has attempted to "bring some discipline to the use" of the term "jurisdictional." *Henderson ex rel. Henderson v. Shinseki,* 131 S. Ct. 1197, 1202 (2011). That precedent suggests that we should be especially cautious in addressing whether the IDEA-exhaustion requirement is a jurisdictional one; we should do so only after careful analysis. *See Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010) ("Our recent cases evince a marked desire to curtail such 'drive-by jurisdictional rulings,' which too easily can miss the 'critical difference[s]' between true jurisdictional conditions and nonjurisdictional limitations on causes of action." (alteration in original) (citations omitted)); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 130 S. Ct. 584, 596 (2009) ("Recognizing that the word 'jurisdiction' has been used by courts, including this Court, to convey 'many, too many, meanings,' we have cautioned, in recent decisions, against profligate use of the term." (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998))).

circuits, however, are split on that very issue. *Compare Payne*, 653 F.3d at 870-71 (joining the Seventh and Eleventh Circuits in holding that IDEA exhaustion is not jurisdictional) *and Charlie F.*, 98 F.3d at 991 (The "failure to exhaust administrative remedies does not deprive a court of jurisdiction; lack of exhaustion usually is waivable, as lack of jurisdiction is not." (collecting Supreme Court precedent)), *with Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d. Cir. 2008) (construing exhaustion as jurisdictional). We have declined to take sides in this debate, and we do so again today. *See M.L. v. Frisco Indep. Sch. Dist.,* 451 F. App'x 424, 427 (5th Cir. 2011) (unpublished); *Gardner v. Caddo Parish Sch. Bd.*, 958 F.2d 108, 112 (5th Cir. 1992).[22]

We need not decide whether exhaustion in general in this area is jurisdictional because Stewart would avoid dismissal even if the IDEA obligated us to consider exhaustion *sua sponte* as a jurisdictional prerequisite. Although the IDEA contemplates the channeling of some § 504 claims through administrative review,[23] *see* 20 U.S.C. § 1415(l), Stewart's claim is not such a claim according to her complaint.[24] *See Payne*, 653 F.3d at 874 (observing that

[22] The *Gardner* court nonetheless doubted that exhaustion is jurisdictional given the existence of judicial exceptions like futility an inadequacy, 958 F.2d at 112, a view that is consistent with recent Supreme Court precedent. *See Union Pacific*, 130 S. Ct. at 596 ("Subject-matter jurisdiction properly comprehended, we emphasize[], refers to a tribunal's 'power to hear a case,' a matter that 'can *never* be forfeited or waived.'" (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (emphasis added)).

[23] There is no basis for the dissenting opinion's suggestion that Congress intended the IDEA to largely supplant the protections otherwise afforded to plaintiffs under § 504. *See* Dissenting Op. at 3 (citing *Smith v. Robinson*, 468 U.S. 992, 1011-12 (1984)). Indeed, Congress specifically—and swiftly—repudiated *Smith*'s contrary interpretation. *See, e.g.*, *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 796 (3d Cir. 2007) (en banc) ("Congress enacted § 1415(l) of the IDEA[] to countermand *Smith* and make clear that actions can be maintained under the Constitution or under federal laws protecting the rights of children with disabilities *notwithstanding* the fact that the IDEA also protects these rights.")(emphasis added).

[24] Stewart pled futility; as with the exhaustion argument in general, the parties have not addressed the issue. We discuss the issue here because we cannot exercise "hypothetical jurisdiction." *See Steel Co.*, 523 U.S. at 101-02. If IDEA exhaustion is jurisdictional, as the

No. 11-51067

IDEA exhaustion applies "only to the extent that the relief actually sought by the plaintiff could have been provided by the IDEA"); *id.* at 877 ("[W]e do not think, especially in the context of motions to dismiss or summary judgment motions, that it is proper for courts to assume that money damages will be directed toward forms of relief that would be available under the IDEA").

As pled, Stewart's § 504 claim seeks monetary damages to hold the District accountable for exercising gross misjudgment in managing Stewart's IEP, a form of disability discrimination that allegedly caused her to suffer repeated instances of sexual abuse. She specifically seeks damages for past "physical pain," "medical expenses," and "physical impairment," as well as past and future "mental anguish" and "mental health expenses." It may be that the IDEA provides or could have provided some of the relief demanded in Stewart's complaint. But we cannot conclude on this record that Stewart actually seeks compensatory or prospective forms of educational relief or related services "also available under" the IDEA, 20 U.S.C. § 1415(l), that "may be required to assist [her so that she can] benefit from special education," *Id.* § 1401(26)(A). *See Payne*, 653 F.3d at 875 ("[W]hether a plaintiff *could have* sought relief available under the IDEA is irrelevant—what matters is whether the plaintiff *actually* sought relief available under the IDEA. In other words, when determining whether the IDEA requires a plaintiff to exhaust, courts should start by looking at a complaint's prayer for relief and determine whether the relief sought is also available under the IDEA. If it is not, then it is likely that § 1415(l) does not require exhaustion in that case.").[25]

---

dissenting opinion implicitly suggests, then we must conclusively establish the basis for our jurisdiction. That necessarily requires us to analyze whether Stewart needed to first administratively exhaust her § 504 claim before presenting it to the district court.

[25] As the en banc Ninth Circuit cautioned in *Payne*, we must be careful at this stage to avoid using exhaustion as a license to speculate about whether plaintiffs like Stewart intend to use a damage award on something conceivably available under the IDEA. *See* 653 F.3d at

No. 11-51067

These conclusions comport with those from other circuits that have recognized the inadequacy of IDEA remedies in analogous circumstances, even some that consider exhaustion jurisdictional. *See M.P. II*, 439 F.3d at 868 (excusing failure to exhaust in gross-misjudgment case because § 504 claim was "wholly unrelated to the IEP process"; plaintiff alleged that the school district "failed to provide him with accommodations in the educational environment; failed to investigate allegations of disability discrimination, student-against-student harassment, [and] hostile education environment . . . ; and failed to take appropriate and effective remedial measures"); *Polera*, 288 F.3d at 489-90 (suggesting that administrative exhaustion is futile where a "school has failed to implement services that were specified or otherwise clearly stated in an IEP"); *Padilla ex rel. Padilla v. Sch. Dist. No. 1*, 233 F.3d 1268, 1275 (10th Cir. 2000) (Cases "that have required plaintiffs who seek damages to exhaust their IDEA administrative remedies have done so where the plaintiffs' alleged injuries were educational in nature and therefore presumptively redressable through the IDEA's administrative procedures." (collecting cases)); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917-18 (6th Cir. 2000) (holding that exhaustion was futile where plaintiff had graduated, his injuries and the conditions giving rise to them occurred in the past, and the IDEA afforded no real relief); *Witte v. Clark Cnty. Sch. Dist.*, 197 F.3d 1271, 1273, 1276 (9th Cir. 1999) (allegations of past physical and psychological abuse and injury could not be remedied through the IDEA, as such injuries "typically are remedied through

877 ("Particularly in contexts where courts are expected to draw inferences in favor of plaintiffs, we do not think it is appropriate to make what are essentially merits determinations in the context of evaluating the need for exhaustion. Nothing in the IDEA protects a school from non-IDEA liability simply because it was making a good-faith attempt to educate its disabled students. If the school's conduct constituted a violation of laws other than the IDEA, a plaintiff is entitled to hold the school responsible under those other laws."). It is unnecessary here for us to determine whether the *Payne* analysis should be fully adopted by our circuit. We simply cite it to show that exhaustion is not necessary under either of the tests commonly utilized.

an award of monetary damages"), *overruled in part on other grounds by Payne*, 653 F.3d at 867.[26]

In short, Stewart's gross-misjudgment theory of liability—premised on sexual abuse fostered by the district's alleged disability discrimination—does not appear to seek damages "as a substitute for relief under the IDEA." *Payne*, 653 F.3d at 877. "Under these narrow circumstances, . . . the IDEA's administrative remedies, oriented as they are to providing prospective educational benefits, [cannot] possibly begin to assuage . . . severe physical, and completely non-educational, injuries." *Padilla*, 233 F.3d at 1274. Accordingly, we conclude that, at this pleading stage, Stewart need not have exhausted her § 504 claim under the IDEA before presenting it to the district court. *See Payne*, 653 F.3d at 871 ("Non-IDEA claims that do not seek relief available under the IDEA are not subject to the exhaustion requirement, even if they allege injuries that could conceivably have been redressed by the IDEA.").[27]

---

[26] *See also McCormick v. Waukegan Sch. Dist. No. 60*, 374 F.3d 564, 569 (7th Cir. 2004) ("The nature of [the plaintiff's] claim is not educational; no change to his IEP could remedy, even in part, the damage done to [his] body. By adding [a claim that could provide damages] to his complaint, [the plaintiff] only seeks to recover for the arguably outrageous actions of [school personnel]."); *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 158 n.11 (2d Cir. 1992) (referencing legislative history explaining that IDEA exhaustion is particularly inappropriate where a school district fails to abide by a student's IEP (citations omitted)); *cf. Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 57-64 (1st Cir. 2002) (concluding that exhaustion applied to plaintiff's claim for money damages under 42 U.S.C. § 1983 premised on school district's alleged failure to provide a free appropriate public education).

[27] The dissenting opinion puts undue reliance on cases where a school district allegedly violated the IDEA for improperly implementing an IEP. *See* Dissenting Op. at 1 n.1. The plaintiffs in *Bobby R.*, for example, brought a claim under only the IDEA and alleged that the school district failed to provide a free appropriate public education by crafting and negligently implementing inadequate IEPs. *See Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 343-45 (5th Cir. 2000). The *Bobby R.* plaintiffs sought IEP modifications and reimbursement for private-placement expenses, relief clearly available under the IDEA. *Id.*

Cases like *Bobby R.* provide scant guidance here. It did not concern exhaustion. Nor did it involve a § 504 claim, and this circuit had not yet adopted the gross-misjudgment standard. If it had, however, IDEA exhaustion "is not intended to temporarily shield school officials from all liability for conduct that violates constitutional and statutory rights that exist *independent* of the IDEA and entitles a plaintiff to relief *different* from what is available under

No. 11-51067

**Conclusion**

Because Stewart plausibly states that the District acted with gross misjudgment in failing to further modify her IEP, we REVERSE the district court's dismissal of Stewart's § 504 claim and REMAND for proceedings consistent with this opinion.  Because Stewart appealed only the dismissal of that claim, we do not address the district court's rulings as to her other claims.

Although the case may go forward to the extent indicated, we note that the pleading is not a model of detail.  Thus, the district court remains free to order that Stewart replead in conformity with the guidance provided in this opinion to state at least those facts that are within her control.  In line with *Payne*'s "relief-centered" approach to exhaustion, moreover, the district court may reevaluate as the case proceeds whether each of Stewart's damage claims actually seeks IDEA relief.  *See* 653 F.3d at 882.  The burden for showing that exhaustion applies, however, falls to the District.  *See, e.g.*, *id.* at 884 (Callahan, J., concurring).

---

the IDEA."  *Payne*, 653 F.3d at 876.  A school district may simultaneously be liable for both violations of the IDEA and other remedial statutes.  *See id.* at 881 ("The dissent would hold that if [an IDEA remedy] *could* correct a student's injuries, then exhaustion is required even if the injuries were caused by a non-IDEA violation for which federal law authorizes remedies apart from the IDEA. . . .  The dissent's approach would effectively refashion § 1415(l) from a provision designed to facilitate the coexistence of the IDEA with other forms of relief into one designed to preempt all cases involving the mistreatment of disabled students by a school. We do not think that the IDEA's exhaustion requirement was intended to penalize disabled students for their disability.  This is not what § 1415(l) says, and we think it is not what Congress intended.").

No. 11-51067

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

This is a suit for money damages against a school district for failing to modify or properly enforce Ms. Stewart's IEP to protect her from sexual contact with fellow students. In reversing the district court's dismissal, the panel majority permits Ms. Stewart to use § 504 of the Rehabilitation Act to enforce her IEP though she never exhausted her administrative remedies under the IDEA. The majority then misapplies § 504 to create tort liability for money damages against the school district. I respectfully dissent.

## I.

Drawing upon a notion of "bilateral cooperation" from Title VII, the majority concludes that § 504 imposed on the school district "an ongoing responsibility to calibrate Stewart's IEP to effectively address the behaviors intended to be prevented by keeping her separated from males and under close supervision." The majority reverses the dismissal below because Stewart's complaint — which devotes itself to chronicling the shortcomings of her IEP — "plausibly states that the [school] [d]istrict acted with gross misjudgment." It reaches this holding "regardless of what role Stewart allegedly played in facilitating th[e] misconduct," because "effective implementation [of Stewart's IEP] would have obviated any need for discipline."

Yet for all the majority's focus on Stewart's IEP, it fails to recognize that the IEP is a creature, not of § 504, but of the IDEA, a quite distinct federal statute. True enough, the IDEA imposes an obligation on the school district to provide an appropriate education that entails furnishing those "related services" necessary to that end — here, amending and enforcing Ms. Stewart's IEP to keep her separated from her male classmates.[1] The IDEA contains its own detailed

---

[1] *See* 20 U.S.C. §§ 1400(d)(1), 1401(26)(a), 1412, 1414, 1415; *see also Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (holding that a school district violates

remedial scheme — an "interactive process" between parents and school districts whose absence the majority bemoans.[2] This process is enabled by congressional insistence that a disabled student exhaust her remedies before resorting to the courts, at least where she "seek[s] relief that is also available under" the IDEA.[3]

Here, neither the complaint nor the amended complaint suggests that Ms. Stewart's parents or guardians ever contacted the school district about any of the alleged instances of sexual abuse, much less the district's responses to them. Ms. Stewart nevertheless attempts to avoid exhaustion by requesting money damages. But at the heart of Ms. Stewart's lawsuit is a dispute over the content and implementation of her IEP, a matter that clearly falls within the purview of the IDEA and is capable of resolution through its administrative processes.[4] Stewart's allegations leave little doubt on this point:

- [Paragraph 15:] In February 2006, *even though [Stewart's] IEP dictated that she was to be kept separate from male classmates and was to be closely supervised*, she was again sexually abused by another student, this time

---

the IDEA where it "fail[s] to implement substantial or significant provisions of the IEP."); *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011) (holding that "a material failure to implement an IEP . . . violates the IDEA."); *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) (holding that "a material failure to implement an IEP violates the IDEA."); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (holding that "fail[ure] to implement an essential element of [an] IEP that was necessary for the child to receive an educational benefit" violates the IDEA).

[2] *Cf. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985) ("In several places, the [IDEA] emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness."); *Klein Indep. Sch. Dist. v. Hoven*, 690 F.3d 390, 395 (5th Cir. 2012) ("The IDEA requires that school districts allow parents to play a significant role in the development of IEPs for each child with a disability. . . [and] also requires states to establish procedures to resolve IEP-related disputes between parents and school districts.").

[3] *See* 20 U.S.C. § 1415(l).

[4] *See, e.g.*, *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000) (rejecting a § 504 claim predicated on the school district's alleged "general[] fail[ure] to implement [the plaintiff's] Plan," observing that the claim "relate[s] unmistakably to the evaluation and educational placement of [the plaintiff] . . . and to the provision of a free appropriate education").

No. 11-51067

in the bathroom. Again, Waco ISD officials were aware of the incident *but her IEP was unmodified* and no additional steps were taken to protect [Stewart] from further sexual abuse.

- [Paragraph 16:] In August 2006, *with [Stewart's] IEP still mandating that she be kept separate from male classmates and be closely supervised*, she was permitted to go to the bathroom unattended. . . . Unfortunately and unsurprisingly, [Stewart] was sexually abused in the bathroom by [a] male classmate. *Waco ISD officials were again aware of this incident and again did not make any changes to [Stewart's] IEP* or take any steps to ensure that she would not be sexually abused in the future.

- [Paragraph 17:] In October 2007, *with [Stewart's] IEP still mandating that she be kept separate from male classmates and be closely supervised*, she was again sexually abused by a male classmate who exposed himself to her. Again . . . school officials suspended [Stewart] from school, depriving her of an educational benefit.

- [Paragraph 21:] *There is nothing indicating any efforts by Waco ISD to properly train and supervise Waco ISD staff in the effective implementation of [Stewart's] IEP. As a result, staff members repeatedly failed to follow the requirements of [Stewart's] IEP.*

- [Paragraph 22:] Despite the determinations by school officials that [Stewart] was complicit in some of these instances of sexual abuse, *there is nothing indicating that any sort of sexual education was contemplated by her ARD Committee and her IEP did not dictate any sort of education for [Stewart] in the inappropriateness of sexual contact at school.*

- [Paragraph 26:] [Stewart] asserts that Waco ISD has violated [her] rights pursuant to [§504 of the] Rehabilitation Act. Defendant's practices and/or proposed actions, *set out in detail above*, have, together and separately, contributed to violating her rights under [§504].

- [Paragraph 27:] In addition and in the alternative, *the failure of the school district to keep [Stewart] safe from a known harm while on campus constitutes a gross mismanagement of her educational plan and also a violation of the Rehabilitation Act thereby.*

- [Paragraph 28:] Furthermore, *the failure to train or supervise Waco ISD staff to ensure that [Stewart's] IEP was properly carried out constitutes a*

No. 11-51067

*gross mismanagement of her education plan and a violation of the Rehabilitation Act thereby.*

In such circumstances, the mere fact that Ms. Stewart prefers a monetary remedy does not exempt her from the statute's exhaustion requirement.[5] For the same reason, Ms. Stewart's perfunctory allegation that exhaustion would be "futile" is unpersuasive.[6]

That we cannot know with certainty what Stewart's timely recourse to her IDEA remedies would have produced is inherent in the requirement of exhaustion. Perhaps those remedies would have avoided all that has followed, or perhaps they would have ultimately fallen short. But "parents cannot know that without asking, any more than we can."[7] The cardinal function of exhaustion is to "enable the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes."[8] Other than in exceptional circumstances that clearly fall outside of the purview of the IDEA, we ought not allow litigants to short-circuit this inherently discretionary process with their own predictions as to what results

---

[5] *See Charlie F. v. Bd. of Educ. of Skokie Sch. Dist.*, 98 F.3d 989, 992 (7th Cir. 1996) (Easterbrook, J.) (rejecting the argument that a suit for money damages is automatically exempt from the IDEA's exhaustion requirement, reasoning that "'relief available' . . . mean[s] relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers.").

[6] *See Rose*, 214 F.3d at 210–11.

[7] *Charlie F.*, 98 F.3d at 993.

[8] *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1094 (1st Cir. 1989).

it *might* have produced.[9]  Here, the allegations in Stewart's complaint leave me convinced "that at least in principle[,] relief is available under the IDEA."[10]

The majority passes over the threshold question of exhaustion because the school district "failed to raise the issue on appeal or in its motion-to-dismiss briefing before the district court."  But we are reviewing the *judgment* of the district court and can affirm its dismissal on any ground raised below and supported by the pleadings.[11]  Here, Stewart pleaded exception to exhaustion. The district's answer not only denied those pleadings but asserted Stewart's failure to exhaust as an affirmative defense.  The exhaustion issue was indisputably presented to the district court.  We not only have the authority to affirm on that basis, but the duty, as the district court's judgment is plainly sound, albeit for reasons it did not reach.

The majority also suggests that exhaustion does not apply because Stewart seeks damages for past physical harms, not "prospective forms of educational relief or related services."  To the extent any injury suffered by Stewart as a result of the school district's alleged mismanagement of her IEP — physical or otherwise — cannot now be redressed through the IDEA's administrative processes, this result is itself the consequence of Stewart's failure to timely exhaust.  To hold that a disabled student can avoid exhaustion simply by *waiting*

---

[9] *Cf. e.g.*, *Padilla v. Sch. Dist. No. 1*, 233 F.3d 1268, 1274 (10th Cir. 2000) ("[T]he dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies. . . . Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem.").

[10] *Charlie F.*, 98 F.3d at 993.

[11] *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148–49 (5th Cir. 2010) (Haynes, J.) ("[I]t is well established . . . that the court of appeals 'may affirm a district court's Rule 12(b)(6) dismissal on any grounds raised below and supported by the record.'").

No. 11-51067

to bring her damages claim until administrative remedies are no longer useful would gut the exhaustion requirement of all meaning.[12]

Congress has elected to channel disputes over the difficulties encountered in mainstreaming disabled children first to the school house, bringing parent and teacher to the conference table.  The congressional judgment is that the overwhelming majority of disputes will be resolved in the process.  If the effort fails to achieve the desired result, parents can resort to the courts. At that juncture, there is less reason to look forward, and more reason to look backward and allocate responsibility for a failure.

## II.

Exhaustion aside, the majority is obligated to read § 504 in harmony with the IDEA and abide the statutes' differences.  As the Supreme Court recognized in *Smith v. Robinson*, "Congress did not intend a handicapped child to be able to circumvent [the IDEA's] requirements or supplement [its] remedies . . . by resort to the general antidiscrimination provision of § 504."[13] This means that when an IEP is in place, its shortcomings must find their answer within the detailed remedial scheme under the IDEA unless those shortcomings are somehow of a meaningfully distinct character.  That distinction inheres in the

[12] *Cf. Polera v. Board of Educ. of the Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478 (2d Cir. 2002) ("We . . . consider it incongruous that [the plaintiff] waited years before pursuing any remedy, yet now claims that the remedy available to her at the time — the [IDEA's] administrative process — would have been too slow.").

[13] *Smith v. Robinson*, 468 U.S. 992, 1011–12 (1984).  *Smith* is merely one manifestation of the principle that "a precisely drawn, detailed statute pre-empts more general remedies." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834 (1976) (holding that "[t]he balance, completeness, and structural integrity" of Title VII evidence that Congress intended it to provide the exclusive remedy for claims of discrimination in federal employment); *see also Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973) (holding that challenges to the fact or scope of imprisonment must be brought under  the habeas statute, not § 1983, as the former is the "more specific act.").

31

language of § 504 as read by the Supreme Court and this Circuit — it is triggered by a "refusal" by the school district to grant a disabled student's request for a reasonable accommodation.[14]

Several courts have gone a step further, substituting "gross misjudgment or bad faith" for refusal.[15] But that was to address the reality that a literal insistence upon a request for accommodation could frustrate the core purpose of § 504 — to prevent discrimination against persons with disabilities.[16] It was not to expand the statute's reach. Accepting this judicial effort, if the congressionally stated liability of § 504 is not to be expanded to reach negligent conduct, then at the least, the words substituted for "refusal" must do no more than capture non-literal refusals. "Bad faith" appears to be fit for this surrogate task, with its draw upon intentionality. "Gross misjudgment" less so. And potentially devastatingly less so. It appears to be not a surrogate for refusal, but "a species of heightened negligence." Yet as the majority correctly suggests, the level of culpability actionable under § 504 should be "consonant with" the "deliberate indifference" we require under the virtually identical discrimination prohibition of Title IX.[17] As we observed in *Brown v. Sibley*, "[t]he overwhelming

---

[14] *Davis*, 442 U.S. at 412–13; *D.A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 454 (5th Cir. 2010) ("Further constraining the viability of claims under the disability non-discrimination laws is this courts long-established rule that[] a cause of action is stated under § 504 when it is alleged that a school district has *refused* to provide reasonable accommodations.").

[15] *See, e.g.*, *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982).

[16] *See D.A.*, 629 F.3d at 454 ("[We] used the term 'refusal' because the statute requires intentional discrimination against a student on the basis of his disability. This is consistent with [*Monahan*].").

[17] *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (noting that to merit an award of damages under Title IX, the school's response "must amount to deliberate indifference to discrimination"); *see also S.S. v. Eastern Kentucky Univ.*, 532 F.3d 445 (6th Cir. 2008) (evaluating a § 504 claim predicated on disability-based peer-on-peer harassment under the "deliberate indifference" standard).

similarity of these . . . passages is no accident. Congress expressly modeled the discrimination prohibition contained in section 504 after the prohibitory language contained in . . . Title IX."[18]

Here, the majority observes, Ms. Stewart's amended complaint alleges that the school district responded to the first incident of misconduct by modifying Stewart's IEP and the second and fourth by investigating the respective incidents and suspending her. Thus, the majority concludes, "although the District's responses may leave something to be desired, the complaint provides insufficient facts to plausibly state that the District's responses were so clearly unreasonable as to rise to the level of deliberate indifference." But the majority continues on, drawing an inference of "bad faith or gross misjudgment" from the school district's alleged mismanagement of Stewart's IEP — now relying on "the three subsequent instances of alleged sexual abuse." This, notwithstanding the fact that Stewart's "cursory" amended complaint, filed with time for discovery, is bereft of detail,

> fail[ing] to address the harassers' identities and relationship to Stewart, the punishments meted out to the harassers, the nature of the abuse, the names and responsibilities of District personnel with knowledge of the harassment, the time-delay between the abuse and the District's response, the extent of Stewart's harm and exclusion from educational opportunities, the specific reasons why the District's responses were obviously inadequate, or the manner in which such responses likely made Stewart susceptible to further discrimination.

With all respect, the majority has in its application of controlling standards created tort liability for money damages, allowing Stewart to proceed on pleadings that, at best, state a plausible claim for oversight or negligence.[19] It

---

[18] 650 F.2d 760, 768 (5th Cir. 1981) (citing S. Rep. No. 93-1297 (1974), *reprinted at* 1974 U.S.C.C.A.N. 6373, 6390–91).

[19] Stewart's bald allegations of "sexual abuse" fail the federal pleading standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("To be clear, we do not reject these bald allegations

No. 11-51067

signifies that Ms. Stewart in her original complaint characterized the school district's failure to abide her IEP as "actionable negligence," a characterization carefully omitted from the amended complaint.[20]

## III.

Today, the majority allows parents unhappy with an IEP to bypass the comprehensive remedial scheme of the IDEA and sue under § 504 for money damages. It then misapplies § 504 to impose on schools a tort-like duty not to mismanage a disabled student's IEP. This unfortunate consequence defies precedent. I would hold that Ms. Stewart's failure to exhaust administrative remedies under the IDEA bars her from seeking money damages under § 504. Alternatively, I would hold that bad faith, gross misjudgment, and deliberate indifference all rest upon substantially identical levels of culpability — levels that approximate the discriminatory animus § 504 was intended to capture. On either wing, the district court's dismissal ought be affirmed.

---

on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of respondent's allegations . . . that disentitles them to the presumption of truth.").

[20] Ms. Stewart's amended complaint departs from her state-court complaint in another noteworthy regard. Whereas the amended complaint suggests that school officials took no action to protect Stewart from peer-on-peer sexual contact in school bathrooms, the original complaint represented that Ms. Stewart's "special education teacher reports that the school did make some attempt to address this problem by permitting [Ms. Stewart] to go to the bathroom after a tardy bell, while the restroom and hall were supposedly clear of any other students.").